FEDERAL RADIO COMMISSION *v.* NELSON BROTHERS BOND & MORTGAGE CO. (STATION WIBO)*

No. 657. Argued April 11, 1933.—Decided May 8, 1933

---

\* Together with No. 658, *Federal Radio Comm'n* v. *North Shore Church (Station WPCC);* No. 659, *Federal Radio Comm'n et al.* v. *Nelson Brothers Bond & Mortgage Co. (Station WIBO);* and No. 660, *Federal Radio Comm'n et al.* v. *North Shore Church (Station WPCC).*

268

*Solicitor General Thacher,* with whom *Messrs. William G. Davis* and *Hammond E. Chaffetz* were on the brief, for the Federal Radio Commission, petitioner.

*Mrs. Mabel Walker Willebrandt* for Johnson-Kennedy Radio Corp., petitioner.

*Mr. James M. Beck,* with whom *Messrs. George R. Beneman, Fred W. Weitzel, John Strother Boyd,* and *Edward Clifford* were on the brief, for respondents.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Johnson-Kennedy Radio Corporation, owning Station WJKS at Gary, Indiana, applied to the Federal Radio Commission for modification of license so as to permit operation, with unlimited time, on the frequency of 560 kc. then assigned for the use of Station WIBO, owned by Nelson Brothers Bond & Mortgage Company, and Station WPCC, owned by the North Shore Church, both of Chicago, Illinois. These owners appeared before the chief examiner, who, after taking voluminous testimony, recommended that the application be denied. The applicant filed exceptions and, on consideration of the evidence, the Commission granted the application and directed a modified license to issue to the applicant authorizing the operation of Station WJKS on the frequency of 560 kc. and terminating the existing licenses theretofore issued for Stations WIBO and WPCC. On appeal, the Court of Appeals of the District of Columbia reversed the Commission's decision upon the ground that it was " in a legal sense arbitrary and capricious." 61 App.D.C. 315; 62 F. (2d) 854. This Court granted certiorari.

The action of the Commission was taken under § 9 of the Radio Act of 1927 (c. 169, 44 Stat. 1166), as amended by § 5 of the Act of March 28, 1928, c. 263, 45 Stat. 373;

47 U.S.C. 89.[1]  The findings of fact upon which the Com-
mission based its order included the following:

Gary, Indiana, about 30 miles from Chicago, is the
largest steel center in the world.  It has a population of
approximately 110,000 and is located in what is known as
the Calumet region which has a population of about
800,000, sixty per cent. of whom are foreign born and rep-
resent over fifty nationalities.  Station WJKS is the only
radio station in Gary and the programs it broadcasts are
well designed to meet the needs of the foreign popula-

[1] Section 5 of the Act of March 28, 1928, 45 Stat. 373, is as follows:
"Sec. 5.  The second paragraph of section 9 of the Radio Act of
1927 is amended to read as follows:
"It is hereby declared that the people of all the zones established by
section 2 of this Act are entitled to equality of radio broadcasting
service, both of transmission and of reception, and in order to provide
said equality the licensing authority shall, as nearly as possible make
and maintain an equal allocation of broadcasting licenses, of bands of
frequency or wave lengths, of periods of time for operation, and of
station power, to each of said zones when and in so far as there are
applications therefor; and shall make a fair and equitable allocation
of licenses, wave lengths, time for operation, and station power to each
of the States, the District of Columbia, the Territories and possessions
of the United States within each zone, according to population.  The
licensing authority shall carry into effect the equality of broadcasting
service hereinbefore directed, whenever necessary or proper, by grant-
ing or refusing licenses or renewals of licenses, by changing periods of
time for operation, and by increasing or decreasing station power,
when applications are made for licenses or renewals of licenses: *Pro-
vided,* That if and when there is a lack of applications from any zone
for the proportionate share of licenses, wave lengths, time of operation,
or station power to which such zone is entitled; the licensing authority
may issue licenses for the balance of the proportion not applied for
from any zone, to applicants from other zones for a temporary period
of ninety days each, and shall specifically designate that said appor-
tionment is only for said temporary period.  Allocations shall be
charged to the State, District, Territory, or possession wherein the
studio of the station is located and not where the transmitter is
located."

tion. These programs include "broadcasts for Hungarian, Italian, Mexican, Spanish, German, Russian, Polish, Croatian, Lithuanian, Scotch and Irish people," and "are musical, educational and instructive in their nature and stress loyalty to the community and the Nation." Programs are arranged and supervised "to stimulate community and racial origin pride and rivalry and to instruct in citizenship and American ideals and responsibilities." "Special safety prevention talks" are given for workingmen, explaining the application of new safeguards of various types of machinery used in the steel mills. The children's hour utilizes selections from various schools. There are "good citizenship talks" weekly by civic leaders. The facilities of the station are made available to the local police department and to all fraternal, charitable and religious organizations in the Calumet region, without charge. Sunday programs consist mainly "of church service broadcasts" including all churches and denominations desiring to participate. Although the Calumet area is served by a station at Fort Wayne and by several stations in Chicago, Station WJKS "is the only station which serves a substantial portion of the area with excellent or even good service." While Station WJKS "delivers a signal of sufficient strength to give good reception in its normal service area if not interfered with, heterodyne and cross-talk interference exist to within three miles of the transmitter and constant objection to interference is found in the good service area of the station, particularly to the south, southeast and east." This interference has increased during the past two years.

Station WIBO is operated by Nelson Brothers Bond & Mortgage Company separately from its mortgage and real estate business. It employs 55 persons and its total monthly expenses average $17,000. In March, 1931, it earned a net profit of $9,000. It represents a total cost of $346,362.99 less a reserve for depreciation of $54,627.36,

and has been operated since April, 1925. Station WIBO was licensed to share time with Station WPCC, the latter being authorized to operate on Sundays during stated hours and by agreement has operated on certain week days in exchange for Sunday hours.

The licenses for Stations WIBO and WPCC, effective from September 1, 1931, to March 1, 1932, were issued upon the following condition: " This license is issued on a temporary basis and subject to such action as the Commission may take after hearing on the application filed by Station WJKS, Gary, Indiana, for the frequency 560 kc. No authority contained herein shall be construed as a finding by the Federal Radio Commission that the operation of this station is or will be in the public interest beyond the term hereof."

The programs broadcast by Station WIBO include a large number of chain programs originating in the National Broadcasting network and are almost entirely commercial in their nature. The same general type of programs broadcast by WIBO, including National Broadcasting chain programs, are received in the service area of WIBO from many other stations located in the Chicago district.

Station WPCC, owned by the North Shore Church, has programs made up entirely of sermons, religious music and talks relating to the work and interests of the church. Contributions are solicited for the use of the church and to advance the matters in which it is interested; it is not used by other denominations or societies. " Other stations in Chicago, including WMBI, owned by the Moody Bible Institute, devoting more time to programs of a religious nature than WPCC, are received in the service area of that station."

" The State of Indiana is 2.08 units or 22 per cent. under-quota in station assignments and the State of Illinois is 12.49 units or 55 per cent. over-quota in such assignments.

The Fourth Zone, in which both States are located, is 21.00 units or 26 per cent. over-quota in station assignments. The granting of this application and deletion of WIBO and WPCC would reduce the over-quota status of the State of Illinois and the Fourth Zone by .88 unit and .45 unit, respectively, and would increase the quota of Indiana by .43 unit."

Summarizing the grounds of its decision, the Commission found:

" 1. The applicant station (WJKS) now renders an excellent public service in the Calumet region and the granting of this application would enable that station to further extend and enlarge upon that service.

" 2. The deletion of Stations WIBO and WPCC would not deprive the persons within the service areas of those stations of any type of programs not now received from other stations.

" 3. Objectionable interference is now experienced within the service area of WJKS through the operation of other stations on the same and adjacent frequencies.

" 4. The granting of this application and deletion of Stations WIBO and WPCC would not increase interference within the good service areas of any other stations.

" 5. The granting of this application and deletion of Stations WIBO and WPCC would work a more equitable distribution of broadcasting facilities within the Fourth Zone, in that there would be an increase in the radio broadcasting facilities of Indiana which is now assigned less than its share of such facilities and a decrease in the radio broadcasting facilities of Illinois which is now assigned more than its share of such facilities.

" 6. Public interest, convenience and/or necessity would be served by the granting of this application."

The Court of Appeals was divided in opinion. The majority pointed out that the Court had repeatedly held that " it would not be consistent with the legislative policy

to equalize the comparative broadcasting facilities of the various states or zones by unnecessarily injuring stations already established which are rendering valuable service to their natural service areas "; and they were of opinion that the evidence showed that Stations WIBO and WPCC had been " serving public interest, convenience and necessity certainly to as great an extent as the applicant station " and that " the conclusively established and admitted facts " furnished no legal basis for the Commission's decision. The minority of the Court took the view that the Court was substituting its own conclusions for those of the Commission; that the Commission had acted within its authority, and that its findings were sustained by the evidence.

*First.* Respondents challenge the jurisdiction of this Court. They insist that the decision of the Court of Appeals is not a ' judicial judgment '; that, for the purpose of the appeal to it, the Court of Appeals is merely a part of the machinery of the Radio Commission and that the decision of the Court is an administrative decision. Respondents further insist that if this Court examines the record, its decision " would not be a judgment, or permit of a judgment to be made in any lower court, but would permit only consummation of the administrative function of issuing or withholding a permit to operate the station."

Under § 16 of the Radio Act of 1927, the Court of Appeals, on appeal from decisions of the Radio Commission, was directed to " hear, review, and determine the appeal " upon the record made before the Commission, and upon such additional evidence as the Court might receive, and was empowered to " alter or revise the decision appealed from and enter such judgment as to it may seem just." 44 Stat. 1169. This provision made the Court " a superior and revising agency " in the administrative field and consequently its decision was not a judicial judgment reviewable by this Court. *Federal Radio*

*Commission* v. *General Electric Co.,* 281 U.S. 464, 467. The province of the Court of Appeals was found to be substantially the same as that which it had, until recently, on appeals from administrative decisions of the Commissioner of Patents. While the Congress can confer upon the courts of the District of Columbia such administrative authority, this Court cannot be invested with jurisdiction of that character whether for the purpose of review or otherwise. It cannot give decisions which are merely advisory, nor can it exercise functions which are essentially legislative or administrative. *Id.,* pp. 468, 469. *Keller* v. *Potomac Electric Power Co.,* 261 U.S. 428, 442-444; *Postum Cereal Co.* v. *California Fig Nut Co.,* 272 U.S. 693, 700.

In the light of the decision in the *General Electric* case, *supra,* the Congress, by the Act of July 1, 1930, c. 788, amended § 16 of the Radio Act of 1927 so as to limit the review by the Court of Appeals. 46 Stat. 844; 47 U.S.C. 96.[2] That review is now expressly limited to " questions

---

[2] By this amendment, § 16 (d) reads as follows:

"At the earliest convenient time the court shall hear and determine the appeal upon the record before it, and shall have power, upon such record, to enter a judgment affirming or reversing the decision of the commission, and, in event the court shall render a decision and enter an order reversing the decision of the commission, it shall remand the case to the commission to carry out the judgment of the court: *Provided, however,* That the review by the court shall be limited to questions of law and that findings of fact by the commission, if supported by substantial evidence, shall be conclusive unless it shall clearly appear that the findings of the commission are arbitrary or capricious. The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 347 of title 28 of the Judicial Code by appellant, by the commission, or by any interested party intervening in the appeal." 46 Stat. 844; 47 U.S.C. 96.

In reporting this amendment, the Committee on the Merchant Marine and Fisheries of the House of Representatives stated: " The purpose of the amendment is to clarify the procedure on appeal to the

of law " and it is provided " that findings of fact by the commission, if supported by substantial evidence, shall be conclusive unless it shall clearly appear that the findings of the commission are arbitrary or capricious." This limitation is in sharp contrast with the previous grant of authority. No longer is the Court entitled to revise the Commission's decision and to enter such judgment as the Court may think just. The limitation manifestly demands judicial, as distinguished from administrative, review. Questions of law form the appropriate subject of judicial determinations. Dealing with activities admittedly within its regulatory power, the Congress established the Commission as its instrumentality to provide continuous and expert supervision and to exercise the administrative judgment essential in applying legislative standards to a host of instances. These standards the Congress prescribed. The powers of the Commission were defined; and definition is limitation. Whether the Commission applies the legislative standards validly set up, whether it acts within the authority conferred or goes beyond it, whether its proceedings satisfy the pertinent demands of due process, whether, in short, there is compliance with the legal requirements which fix the province of the Commission and govern its action, are appropriate questions for judicial decision. These are questions of law upon which the Court is to pass. The provision that the Commission's findings of fact, if supported by substantial evidence, shall be conclusive unless it clearly appears that the findings are arbitrary or capricious, cannot be regarded as an attempt to vest in the Court an authority to revise the action of the Commission from an ad-

court from decisions of the Federal Radio Commission, to more clearly define the scope of the subject matter of such appeals, and to insure a review of the decision of the Court of Appeals of the District of Columbia by the Supreme Court." H.R.Rep. No. 1665, 71st Cong., 2d Sess., p. 2.

ministrative standpoint and to make an administrative judgment. A finding without substantial evidence, to support it—an arbitrary or capricious finding—does violence to the law. It is without the sanction of the authority conferred. And an inquiry into the facts before the Commission, in order to ascertain whether its findings are thus vitiated, belongs to the judicial province and does not trench upon, or involve the exercise of administrative authority. Such an examination is not concerned with the weight of evidence or with the wisdom or expediency of the administrative action. *Interstate Commerce Commission* v. *Illinois Central R. Co.,* 215 U.S. 452, 470; *Interstate Commerce Commission* v. *Union Pacific R. Co.,* 222 U.S. 541, 547, 548; *New England Divisions Case,* 261 U.S. 184, 203, 204; *Keller* v. *Potomac Electric Power Co., supra; Chicago Junction Case,* 264 U.S. 258, 263, 265; *Silberschein* v. *United States,* 266 U.S. 221, 225; *Ma-King Products Co.* v. *Blair,* 271 U.S. 479, 483; *Federal Trade Commission* v. *Klesner,* 280 U.S. 19, 30; *Tagg Bros.* v. *United States,* 280 U.S. 420, 442; *Federal Trade Commission* v. *Raladam Co.,* 283 U.S. 643, 654; *Crowell* v. *Benson,* 285 U.S. 22, 49, 50.

If the questions of law thus presented were brought before the Court by suit to restrain the enforcement of an invalid administrative order, there could be no question as to the judicial character of the proceeding. But that character is not altered by the mere fact that remedy is afforded by appeal. The controlling question is whether the function to be exercised by the Court is a judicial function, and, if so, it may be exercised on an authorized appeal from the decision of an administrative body. We must not " be misled by a name, but look to the substance and intent of the proceeding." *United States* v. *Ritchie,* 17 How. 525, 534; *Stephens* v. *Cherokee Nation,* 174 U.S. 445, 479; *Federal Trade Commission* v. *Eastman Co.,* 274 U.S. 619, 623; *Old Colony Trust Co.* v. *Commissioner,* 279

U.S. 716, 722–724. " It is not important," we said in *Old Colony Trust Co.* v. *Commissioner, supra,* " whether such a proceeding was originally begun by an administrative or executive determination, if when it comes to the court, whether legislative or constitutional, it calls for the exercise of only the judicial power of the court upon which jurisdiction has been conferred by law." Nor is it necessary that the proceeding to be judicial should be one entirely *de novo.* When on the appeal, as here provided, the parties come before the Court of Appeals to obtain its decision upon the legal question whether the Commission has acted within the limits of its authority, and to have their rights, as established by law, determined accordingly, there is a case or controversy which is the appropriate subject of the exercise of judicial power. The provision that, in case the Court reverses the decision of the Commission, " it shall remand the case to the Commission to carry out the judgment of the Court " means no more than that the Commission in its further action is to respect and follow the Court's determination of the questions of law. The procedure thus contemplates a judicial judgment by the Court of Appeals and this Court has jurisdiction, on certiorari, to review that judgment in order to determine whether or not it is erroneous. *Osborn* v. *United States Bank,* 9 Wheat. 738, 819; *In re Pacific Railway Commission,* 32 Fed. 241, 255; *Federal Trade Commission* v. *Klesner, supra; Federal Trade Commission* v. *Raladam Co., supra; Old Colony Trust Co.* v. *Commissioner, supra.*

*Second.* In this aspect, the questions presented are (1) whether the Commission, in making allocations of frequencies or wave lengths to States within a zone, has power to license operation by a station in an ' under-quota ' State on a frequency theretofore assigned to a station in an ' over-quota State, and to terminate the license of the latter station; (2) whether, if the Commis-

sion has this power, its findings of fact sustain its order in the instant case, in the light of the statutory requirements for the exercise of the power, and, if so, whether these findings are supported by substantial evidence; and (3) whether, in its procedure, the Commission denied to the respondents any substantial right.

(1) No question is presented as to the power of the Congress, in its regulation of interstate commerce, to regulate radio communications. No state lines divide the radio waves, and national regulation is not only appropriate but essential to the efficient use of radio facilities. In view of the limited number of available broadcasting frequencies, the Congress has authorized allocation and licenses. The Commission has been set up as the licensing authority and invested with broad powers of distribution in order to secure a reasonable equality of opportunity in radio transmission and reception.

The Radio Act divides the United States into five zones, and Illinois and Indiana are in the Fourth Zone. § 2; 47 U.S.C. 82. Except as otherwise provided in the Act, the Commission "from time to time, as public convenience, interest, or necessity requires," is directed to "assign bands of frequency or wave lengths to the various classes of stations and assign frequencies or wave lengths for each individual station and determine the power which each station shall use and the time during which it may operate," and to "determine the location of classes of stations or individual stations." § 4 (c) (d); 47 U.S.C. 84. By § 9, as amended in 1928, the Congress declared that the people of all the zones "are entitled to equality of radio broadcasting service, both of transmission and of reception," and that "in order to provide said equality the licensing authority shall as nearly as possible make and maintain an equal allocation of broadcasting licenses, of bands of frequency or wave lengths, of periods of time for operation, and of station power, to each of said zones

when and in so far as there are applications therefor.";
and the Commission is further directed to "make a fair
and equitable allocation of licenses, wave lengths, time
for operation and station power to each of the States, . . .
within each zone, according to population"; and the Com-
mission is to "carry into effect the equality of broadcast-
ing service, . . . whenever necessary or proper, by grant-
ing or refusing licenses or renewals of licenses, by
changing periods of time for operation and by increasing
or decreasing station power when applications are made
for licenses or renewals of licenses." § 9; 47 U.S.C. 89.[3]

By its General Order No. 40, of August 30, 1928;[4] the
Commission established a basis for the equitable distribu-
tion of broadcasting facilities in accordance with the Act.
That order, as amended, provided for the required appor-
tionment by setting aside a certain number of frequencies
for use by stations operating on clear channels for distant
service, and other frequencies for simultaneous use by
stations operating in different zones, each station serving
a regional area, and still others for use by stations serving
city or local areas. These three classes of stations have
become known as "clear, regional, and local channel sta-
tions." A new allocation of frequencies, power and hours
of operation, was made in November, 1928,[5] to conform
to the prescribed classification. It was found to be im-
practicable to determine the total value of the three
classes of assignments so that it could be ascertained
whether a State was actually "under or over quota on
total radio facilities," and the Commission developed a
"unit system" in order "to evaluate stations, based on
type of channel, power and hours of operation, and all
other considerations required by law." In June 1930, the

[3] See Note 1.
[4] Report, 1928, Federal Radio Commission, pp. 17, 48.
[5] Id., pp. 18, 215–218.

Commission issued its General Order No. 92[6] specifying the " unit value " of stations of various types, and in this way the Commission was able to make a tabulation by zones and States showing the " units due," based on estimated population, and the " units assigned." This action called for administrative judgment, and no ground is shown for assailing it. It appears that, with respect to total broadcasting facilities, Indiana is " under quota " and Illinois is " over quota " in station assignments.

Respondents contend that the Commission has departed from the principle set forth in its General Order No. 92, because it has ignored the fact that, both Indiana and Illinois being under quota in regional station assignments, Indiana has more of such assignments in proportion to its quota than has Illinois, and by ordering the deletion of regional stations in Illinois in favor of an Indiana station, the Commission has violated the command of Congress, by increasing the under quota condition of Illinois in favor of the already superior condition of Indiana with respect to stations of that type. We find in the Act no command with the import upon which respondents insist. The command is that there shall be a " fair and equitable allocation of licenses, wave lengths, time for operation and station power to each of the States within each zone." It cannot be said that this demanded equality between States with respect to every type of station. Nor does it appear that the Commission ignored any of the facts shown by the evidence. The fact that there was a disparity in regional station assignments, and that Indiana had more of this type than Illinois, could not be regarded as controlling. In making its " fair and equitable allocations," the Commission was entitled and required to consider all the broadcasting facilities assigned to the respective States, and all the advantages thereby enjoyed,

---

[6] Report, 1930, Federal Radio Commission, pp. 4, 24.

and to determine whether, in view of all the circumstances of distribution, a more equitable adjustment would be effected by the granting of the application of Station WJKS and the deletion of Stations WIBO and WPCC.

To accomplish its purpose, the statute authorized the Commission to effect the desired adjustment "by granting or refusing licenses or renewals of licenses, by changing periods of time for operation, and by increasing or decreasing station power." This broad authority plainly extended to the deletion of existing stations if that course was found to be necessary to produce an equitable result. The context, as already observed, shows clearly that the Congress did not authorize the Commission to act arbitrarily or capriciously in making a redistribution, but only in a reasonable manner to attain a legitimate end. That the Congress had the power to give this authority to delete stations, in view of the limited radio facilities available and the confusion that would result from interferences, is not open to question. Those who operated broadcasting stations had no right superior to the exercise of this power of regulation. They necessarily made their investments and their contracts in the light of, and subject to, this paramount authority. This Court has had frequent occasion to observe that the power of Congress in the regulation of interstate commerce is not fettered by the necessity of maintaining existing arrangements which would conflict with the execution of its policy, as such a restriction would place the regulation in the hands of private individuals and withdraw from the control of Congress so much of the field as they might choose by prophetic discernment to bring within the range of their enterprises. *Union Bridge Co.* v. *United States,* 204 U.S. 364, 400, 401; *Philadelphia Company* v. *Stimson,* 223 U.S. 605, 634, 638; *Philadelphia, Baltimore & Washington R. Co.* v. *Schubert,* 224 U.S. 603, 613, 614; *Greenleaf John-*

*son Lumber Co. v. Garrison,* 237 U.S. 251, 260; *Continental Insurance Co. v. United States,* 259 U.S. 156, 171; *Sproles* v. *Binford,* 286 U.S. 374, 390, 391; *Stephenson* v. *Binford,* 287 U.S. 251, 276; *City of New York* v. *Federal Radio Commission,* 36 F. (2d) 115; 281 U.S. 729; *American Bond & Mortgage Co.* v. *United States,* 52 F. (2d) 318; 285 U.S. 538; *Trinity Methodist Church, South* v. *Federal Radio Commission,* 61 App.D.C. 311; 62 F. (2d) 850; 288 U.S. 599.

Respondents urge that the Commission has misconstrued the Act of Congress by apparently treating allocation between States within a zone as subject to the mandatory direction of the Congress relating to the zones themselves. Respondents say that as to zones Congress requires an "equal" allocation, but as between States only "a fair and equitable" allocation, and that the provision "for granting or refusing licenses or renewals of licenses" relates to the former and not to the latter. It is urged that this construction is fortified by the proviso in § 9 as to temporary permits for zones.[7] We think that this attempted distinction is without basis. The Congress was not seeking in either case "an exact mathematical division."[8] It was recognized that this might be physically impossible. The equality sought was not a mere matter of geographical delimitation. The concern of the Congress was with the interests of the people,— that they might have a reasonable equality of opportunity in radio transmission and reception, and this involved an equitable distribution not only as between zones but as between States as well. And to construe the authority conferred, in relation to the deletion of stations, as being applicable only to an apportionment between zones and

---

[7] See Note 1.

[8] Report of the Committee on the Merchant Marine and Fisheries, H.R.Rep. No. 800, 70th Cong. 1st sess., p. 3.

not between States, would defeat the manifest purpose of the Act.

We conclude that the Commission, in making allocations of frequencies to States within a zone, has the power to license operation by a station in an under-quota State on a frequency theretofore assigned to a station in an over-quota State, provided the Commission does not act arbitrarily or capriciously.

(2) Respondents contend that the deletion of their stations was arbitrary, in that they were giving good service, that they had not failed to comply with any of the regulations of the Commission, and that no proceeding had been instituted for the revocation of their licenses as provided in § 14 of the Act. 47 U.S.C., 94. That section permits revocation of particular licenses by reason of false statements or for failure to operate as the license required or to observe any of the restrictions and conditions imposed by law or by the Commission's regulations. There is, respondents say, no warrant in the Act for a "forfeiture" such as that here attempted. But the question here is not with respect to revocation under § 14, but as to the equitable adjustment of allocations demanded by § 9. The question is not simply as to the service rendered by particular stations, independently considered, but as to relative facilities,—the apportionment as between States. At the time of the proceeding in question respondents were operating under licenses running from September 1, 1931, to March 1, 1932, and which provided in terms that they were issued " on a temporary basis and subject to such action as the Commission may take after hearing on the application filed by Station WJKS " for the frequency 560 kc. Charged with the duty of making an equitable distribution as between States, it was appropriate for the Commission to issue temporary licenses with such a reservation in order to preserve its freedom to act in the light of its decision on that application. And when

decision was reached, there was nothing either in the provisions of § 14, or otherwise in the Act, which precluded the Commission from terminating the licenses in accordance with the reservation stipulated.

In granting licenses the Commission is required to act "as public convenience, interest or necessity requires." This criterion is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power. Compare *N.Y. Central Securities Co.* v. *United States,* 287 U.S. 12, 24. The requirement is to be interpreted by its context, by the nature of radio transmission and reception, by the scope, character and quality of services, and, where an equitable adjustment between States is in view, by the relative advantages in service which will be enjoyed by the public through the distribution of facilities. In making such an adjustment the equities of existing stations undoubtedly demand consideration. They are not to be the victims of official favoritism. But the weight of the evidence as to these equities and all other pertinent facts is for the determination of the Commission in exercising its authority to make a "fair and equitable allocation."

In the instant case the Commission was entitled to consider the advantages enjoyed by the people of Illinois under the assignments to that State, the services rendered by the respective stations, the reasonable demands of the people of Indiana, and the special requirements of radio service at Gary. The Commission's findings show that all these matters were considered. Respondents say that there had been no material change in conditions since the general reallocation of 1928. But the Commission was not bound to maintain that allocation if it appeared that a fair and equitable distribution made a change necessary. Complaint is also made that the Commission did not adopt the recommendations of its examiner. But the Commission had the responsibility of decision and was

not only at liberty but was required to reach its own conclusions upon the evidence.

We are of the opinion that the Commission's findings of fact, which we summarized at the outset, support its decision, and an examination of the record leaves no room for doubt that these findings rest upon substantial evidence.

(3) Respondents raise a further question with respect to the procedure adopted by the Commission. In January, 1931, the Commission issued its General Order No. 102 [9] relating to applications from under quota States. This order provided, among other things, that " applications from under-quota States in zones which have already allocated to them their pro rata share of radio facilities should be for a facility already in use in that zone by an over-quota State," and that, since the Commission had allocated frequencies for the different classes of stations, " applications should be for frequencies set aside by the Commission for the character of station applied for." Respondents insist that these requirements foreclosed the exercise of discretion by the Commission by permitting the applicant to select the station and the facilities which it desired; that this " naked action of the applicant " precluded the Commission from " giving general consideration to the field " and from making that fair and equitable allocation which is the primary command of the statute. We think that this argument misconstrues General Order No. 102. That order is merely a rule of procedural convenience, requiring the applicant to frame a precise proposal and thus to present a definite issue. The order in no way derogates from the authority of the Commission. While it required the applicant to state the facilities it desires, there was nothing to prevent respondents from contesting the applicant's demand upon the ground

---

[9] Report, 1931, Federal Radio Commission, p. 91.

that other facilities were available and should be granted in place of those which the applicant designated. If such a contention had been made, there would have been no difficulty in bringing before the Commission other stations whose interests might be drawn in question. There is no showing that the respondents were prejudiced by the operation of the order in question.

Respondents complain that they were not heard in argument before the Commission. They were heard before the examiner and the evidence they offered was considered by the Commission. The exceptions filed by the applicant to the examiner's report were filed and served upon the respondents in August, 1931, and the decision of the Commission was made in the following October. While the request of the applicant for oral argument was denied, it does not appear that any such request was made by respondents or that they sought any other hearing than that which was accorded.

We find no ground for denying effect to the Commission's action. The judgment of the Court of Appeals is reversed and the cause is remanded with direction to affirm the decision of the Commission.

*Reversed.*