The NEW JERSEY COALITION FOR FAIR BROADCASTING, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States, Respondents,

WPIX, Inc., Metromedia, Inc., Westinghouse Broadcasting Company, Inc., National Broadcasting Company, Inc., CBS Inc., Capital Cities Communications, Inc., Kaiser Broadcasting Company, RKO General, Inc., Educational Broadcasting Corporation, American Broadcasting Companies, Inc., Ethan Allen Hitchcock, Esquire, Chairman of the Board of Educational Broadcasting Corporation, Brendan Byrne, Governor of the State of New Jersey, Intervenors.

No. 76–2674.

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1978.

Decided March 22, 1978.

Kristin Booth Glen, Ellen Shaw Agress, New York City, Mary L. Lyndon, Trenton, N. J., Moore, Berson & Lifflander, New York City, for petitioner.

John Shenefield, Barry Grossman, Frederic Freilicher, Washington, D. C., for United States of America.

Sheldon M. Guttmann, Werner K. Hartenberger, Daniel M. Armstrong, Keith H. Fagan, Raymond Strassburger, Washington, D. C., for F. C. C.

R. Russell Eagan, Aloysius B. McCabe, Robert A. Beizer, Philip J. Davis, Kirkland, Ellis & Rowe, Washington, D. C., for WPIX, Inc.

Thomas J. Dougherty, Preston R. Padden, Washington, D. C., for Metromedia, Inc.

John D. Lane, J. Carter McKaig, Ramsey L. Woodworth, Hedrick & Lane, Washington, D. C., for Westinghouse Broadcasting Co., Inc.

Bernard Koteen, Alan Y. Naftalin, Arthur B. Goodkind, Washington, D. C., Corydon B. Dunham, New York City, Howard Monderer, Washington, D. C., for National Broadcasting Co., Inc.

Eleanor S. Applewhaite, Joseph DeFranco, Gerald Tze-Ping Sun, New York City, for CBS Inc.

Joel Rosenbloom, Stephen A. Weiswasser, Edward Tynes Hand, Wilmer, Cutler & Pickering, Washington, D. C., for Capital Cities Communications, Inc. and CBS Inc.

J. Laurent Scharff, Pierson, Ball & Dowd, Washington, D. C., for RKO General, Inc.

Vernon L. Wilkinson, McKenna, Wilkinson & Kittner, Washington, D. C., for Educational Broadcasting Corp. and Ethan Allen Hitchcock, Esquire, Chairman, etc.

James A. McKenna, Jr., Carl R. Ramey, McKenna, Wilkinson & Kittner, Washington, D. C., for American Broadcasting Companies, Inc.

Roger M. Schwarz, Trenton, N. J., for Brendan Byrne, Governor of the State of New Jersey.

Before ALDISERT and HUNTER, Circuit Judges and HUYETT, District Judge.*

## OPINION

JAMES HUNTER, III, Circuit Judge:

This appeal comes to us upon a petition by the New Jersey Coalition for Fair Broadcasting (Coalition) for review of orders of the Federal Communications Commission which terminated an inquiry into the adequacy of television service in the state of New Jersey. We have jurisdiction under section 402(a) of the Communications Act of 1934, 47 U.S.C. § 402(a) (1970), and 28 U.S.C. § 2342(1) (Supp. V. 1975). Since we find that the Commission's actions accorded with applicable statutory law, were neither arbitrary nor capricious, and do not constitute an abuse of discretion, we deny the petition for review.

## I

The New Jersey Coalition for Fair Broadcasting [1] filed a "Petition for Inquiry Into the Need for Adequate Television Service for the State of New Jersey" with the Federal Communications Commission on March 4, 1974. In the petition the Coalition argued that the allocation of television channels among New Jersey and its neighboring states was inequitable and violated the statutory mandate of section 307(b) of the Communications Act of 1934 (as amended), which requires a "fair, efficient and equitable distribution of radio service" among states and communities.[2] The Coalition requested Commission rulemaking to remedy the deficiencies in service to New Jersey.

At present, the FCC allocates one VHF channel and fourteen UHF channels to New Jersey. The one VHF channel, Channel 13, although still formally licensed in Newark, N.J., has moved its operations to New York City and has become a non-commercial station. *NTA Television Broadcasting Corp.*, 44 F.C.C. 2563 (1961). Of the fourteen UHF channels, only nine are now used. Five are commercial stations, and four are non-commercial stations operated by the New Jersey Public Broadcasting Authority.[3] The primary television service in

---

* Honorable Daniel Henry Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. As of the time of this petition for review, the Coalition was co-chaired by the Hon. Harrison A. Williams, Hon. Clifford P. Case, Hon. Kenneth A. Gibson, Hon. Raymond H. Bateman, and the Hon. Thomas H. Kean. Member organizations were New Jersey Education Association; League of Women Voters of New Jersey; United Auto Workers, Region 9; New Jersey State AFL–CIO; Aspira, Inc. of New Jersey; New Jersey Council of Churches; Committee for Unified Newark; North Ward Educational and Cultural Center, Newark; Urban League of Essex County; Greater Newark Chamber of Commerce; Rutgers University, Dep't of Educational Radio and TV; American Association of University Women, New Jersey Division; Archdiocese of Newark; New Jersey SANE; New Jersey Public Interest Research Group; Jewish Community Federation of Metropolitan New Jersey; New Jersey Common

Cause; New Jersey State Chamber of Commerce; National Organization for Women, New Jersey Chapter; New Jersey Hospital Association; New Jersey Conference of Mayors; Greater Newark Urban Coalition; Advertising Club of New Jersey; New Jersey State Bar Association.

2. 47 U.S.C. § 307(b) (1970). The section provides:

In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

3. The Commission has noted that certain of the commercial UHF channels in New Jersey program a substantial amount of foreign language

New Jersey, particularly for VHF programming, comes from the several stations licensed in New York City and Philadelphia.[4]

The Coalition contended in its petition that although New Jersey constitutes an important and self-contained commercial, political, and cultural community, its residents receive inadequate television service. The inadequacy, it was argued, results from the lack of VHF channels operating in the state and the failure of the New Jersey UHF channels and of stations operating in the neighboring states to serve as substitutes for local VHF service. The Coalition stressed its evidence of the failure of New Jersey residents to receive adequate local news and public affairs programming.

To remedy this problem, the Coalition offered three suggestions. First, it urged the FCC to assign one or more "short-spaced" commercial VHF channels to the state. Second, it suggested the reassignment of a New York or Philadelphia VHF channel to the state. This request later became refined to the relocation of Channel 7, which is currently used by WABC in New York City, to Freehold, N.J. Third, the FCC was asked to force the "dual-licensing" or "hyphenation" of one or more out-of-state VHF stations to include a New Jersey community.[5] All remedies emphasized the need for a local, commercial VHF station in the state.

On February 6, 1975, the Commission granted the Coalition's petition and issued a *Notice of Inquiry and Notice of Proposed Rulemaking*, 40 Fed.Reg. 6513 (1975). The notice invited comment on the Coalition's proposals.

After eight months, the FCC issued its *First Report and Order and Further Notice of Proposed Rulemaking*, 58 F.C.C.2d 790 (1976) [*First Report*]. This report concluded that the Commission's table of television allocations did not, as was alleged by the Coalition, violate the requirements of equitable distribution in section 307(b) of the Communications Act. In reaching its conclusion, the FCC relied on the presence of UHF channels in the state and the service provided by the several stations licensed in other states. The Commission noted that some 37 Grade B or better signals penetrated the state, and that in most areas New Jersey residents could receive 15 or more signals without cable service.[6]

Beyond the statutory requirements of section 307, however, the FCC made a discretionary finding in the *First Report* that New Jersey was in need of additional television coverage, particularly with respect to local news and public affairs. The Commission concluded that additional comments would be needed before it could make a rule

material, and that the New Jersey Public Broadcasting Authority's network of stations "apparently suffers from funding shortages." *First Report and Order and Further Notice of Proposed Rulemaking*, 58 F.C.C.2d 790, 792 n.5, 795 (1976).

4. Additional VHF service is provided on Channel 12 by a non-commercial station licensed in Wilmington, Delaware and transmitting from Philadelphia.

5. "Hyphenation" as used in the Coalition's proposal, means that a television station would be licensed in two cities, for example, in New York, N.Y. and Newark, N.J. or in Philadelphia, Pa. and Camden, N.J. Since, under Commission rules and policy, a station has a "primary" service obligation to the city of license, hyphenation would result in one or more stations with an obligation of "primary" service to a New Jersey city as well as to a city in either New York or Pennsylvania.

The Commission noted that "hyphenation" as a means of expanding a station's primary service duty would be unprecedented. It contrasted the Coalition's proposal to other FCC actions which have been called "hyphenation." These have included waiving station identification rules, 47 C.F.R. § 73.1201 (1976), to permit a station to use two cities in its promotional materials, and a modification of the Television Table of Assignment, 47 C.F.R. § 73.606 (1976), to allow a licensee to choose the particular city in which it wished to be licensed. In either of these cases, the station still maintains its primary service obligation to only one city. *See* Second Report and Order, 59 F.C.C.2d 1386, 1393 (1976).

6. The Commission also questioned the methodology, accuracy and significance of studies monitoring the adequacy of television service to New Jersey which were submitted by the Coalition and others. *See First Report and Order and Further Notice of Proposed Rulemaking*, 58 F.C.C.2d 790, 796 (1976).

prescribing the precise remedy for the problem. The *First Report* therefore invited further comment on what facilities out-of-state television stations might be required to place in New Jersey, and on what other steps would constitute an effective "physical presence." Although the establishment of permanent television studios in the state was mentioned, the FCC also inquired what alternative measures might remedy the inadequacies in service. It emphasized that in determining the appropriate remedy, it would

> seek to avoid, to every extent possible, (1) the dislocation and loss of television service, (2) the creation of unmanageable burdens on licensees, (3) the intrusion into programming decisions, and (4) the establishment of a body of precedent having untoward effects on future Commission regulation and licensing of television stations. 58 F.C.C.2d at 799–800.

The *First Report* also addressed the specific proposals made by the Coalition. During the comment period following the notice of rulemaking, the Coalition had abandoned its proposal for an additional "short-spaced" television station in New Jersey as technically infeasible. The Commission agreed with this assessment. The FCC also rejected the proposed relocation of VHF Channel 7 to Freehold, N.J. It found that, given the financial and other uncertainties surrounding the use of the channel by a New Jersey station, there was a low likelihood that the station would be successful in actually improving the local news and public affairs coverage in the state. On balance this low probability of improvement did not outweigh the several factors disfavoring relocation.[7] Finally, the Commission

requested that further comment be given on the Coalition's proposal for "hyphenation" of a New York or Pennsylvania license to include a New Jersey community.

After receiving further comment, the FCC issued its *Second Report and Order,* 59 F.C.C.2d 1386 (1976) [*Second Report*]. Although no petitions for reconsideration of the *First Report* were filed, the Commission *sua sponte* reviewed and reaffirmed its conclusions in that report that there was a need for increased television service in New Jersey but that relocation of a VHF station from New York or Pennsylvania to New Jersey would not be an appropriate remedy. The *Second Report* then rejected the Coalition's proposal for "hyphenation." The Commission concluded that this proposal was not necessary to the improvement of New Jersey television service. It further pointed out that adopting the proposal would have the adverse effect of placing an inflexible service obligation on the stations involved and would likely create an unneeded and unmanageable precedent for the Commission.

The *Second Report* ended with the Commission's decision that in order to remedy the need for additional service in New Jersey, VHF stations which broadcast into the state would be required to assume a "special New Jersey service obligation." 59 F.C.C.2d at 1405. The Commission emphasized that these obligations would be greater than those previously assumed by the stations as a part of their general, areawide service obligation.[8]

The *Second Report* then gave specific "guidelines" of what the Commission believed to be an adequate special commit-

---

**7.** Two countervailing factors were emphasized by the Commission. First was the disruption and loss of service to portions of Connecticut and Long Island. Second was the need to transfer WABC, New York, which currently uses Channel 7, to another New York channel. The Commission felt this shuffle to be necessary to conform to the mandate of *American Broadcasting-Paramount Theatres, Inc. v. FCC,* 120 U.S.App.D.C. 264, 345 F.2d 954 (1965), *cert. denied,* 383 U.S. 906, 86 S.Ct. 880, 15 L.Ed.2d 662 (1966), which it read as requiring

parity among the three major networks' flagship stations.

**8.** A broadcast station must fulfill two sorts of service obligations under its license. It has a primary obligation to serve its city of license, and a secondary obligation of wide-area service to other areas covered by its signals. *See First Report and Order and Further Notice of Proposed Rulemaking,* 58 F.C.C. 790, 799 (1976); *NTA Television Broadcasting Corp.,* 44 F.C.C. 2563, 2577–78 (1961).

ment to New Jersey service. The guidelines included the assignment of crews and reporters to New Jersey and the creation of various means to facilitate the access of New Jersey news to the out-of-state broadcasters.[9] The Commission directed New York and Philadelphia VHF stations to supplement their license renewal applications with a statement of their New Jersey commitment. The final remedy, including the possibility of requiring at least some stations to open New Jersey studios, was left open for further consideration.

When the stations had submitted their statements describing what they were willing to commit to the fulfillment of a New Jersey service obligation, the Commission issued its *Third Report and Order,* 62 F.C.C.2d 604 (1976) [*Third Report*], which ended the rulemaking proceeding. The Commission concluded that the statements submitted by the television stations, which in large part conformed to the suggested guidelines,[10] were sufficient to provide the needed additional service for New Jersey. The *Third Report* rejected the requirement of a permanent New Jersey studio on the grounds that "mobility and flexibility are the keynotes" to effective coverage of New Jersey public affairs, and that permanent studios were unnecessary in light of current technology and the stations' commitment of news crews to the state. Lastly, the Commission made clear that the supplemental renewal statements would be viewed as firm commitments of the licensees, and that it would "closely examine, in the [license] renewal process, the implementation of these New Jersey service commitments." 62 F.C.C.2d at 609.

The Coalition's petition for review followed. In its petition, the Coalition argues two major points. First, it renews its contention that the current channel allocation scheme violates section 307(b) of the Communications Act. Second, it argues that the Commission violated several aspects of reasoned decision-making and that the result reached in the proceedings is an arbitrary and capricious exercise of the Commission's authority, as well as an abuse of its discretion.

## II

The principal issue raised in the petition for review is that the FCC was incorrect in concluding that the current allocation of television channels did not violate section 307(b) of the Communications Act of 1934, as amended in 1936. The Coalition argues that allocation of channels to New Jersey does not meet the statutory requirement of a "fair, efficient, and equitable distribution of radio service." The Coalition points to cases which have used the term "service" to include both "transmission" and "reception" of signals. *See, e. g., Pasadena Broadcasting Co. v. FCC,* 181 U.S.App.D.C. 109, 113–114, 555 F.2d 1046, 1050–51 (1977); *Fort Harrison Telecasting Corp. v. FCC,* 116 U.S. App.D.C. 347, 350–51, 324 F.2d 379, 382–83 (1963), *cert. denied,* 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964). *See also Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co.,* 289 U.S. 266, 279, 53 S.Ct. 627, 77 L.Ed. 1166 (1933) (decided under previous version of section 307(b), which set quota for channel allocation among five national zones). It concludes that the disparity of VHF transmission allocations

---

**9.** The guidelines indicated that each out-of-state network affiliate should commit itself to maintain for New Jersey coverage at least one full-time news crew plus additional crews as needed and at least one full-time correspondent. In addition, the Commission suggested consideration of toll-free New Jersey telephone lines, functionally significant New Jersey offices, and one or more microwave relay systems. The Commission also thought it appropriate for stations to make non-official promotional station identification announcements highlighting their New Jersey service responsi-

bilities. Independent and noncommercial stations were expected to make similar commitments, although lesser demonstrations would be acceptable upon a showing of justification. *Second Report and Order,* 59 F.C.C.2d 1386, 1406 (1976).

**10.** All network affiliates fulfilled the requirements of news crew and reporter time in New Jersey. Stations varied on commitments to the other services which the Commission had requested them to consider. *See Third Report and Order,* 62 F.C.C.2d 604 (1976).

among New Jersey and its neighbors violates the Act.

The Commission, on the other hand, argues that the evidence presented does not show a violation of section 307(b). It points out that the UHF allocations in New Jersey and the service provided by both VHF and UHF stations from other states meet the statutory requirements.

The Coalition counters that, given the facts presented to the Commission, out-of-state channels and UHF coverage do not in fact provide New Jersey with service which is sufficient to satisfy the requirements of section 307(b). The Coalition concludes that only the establishment of a commercial, VHF station in New Jersey will meet the equitable distribution requirements.

At the outset we note that our standard of review of this informal rulemaking proceeding is prescribed by subsections 706(2)(A)–(D) of the APA, 5 U.S.C. § 706(2)(A)–(D) (1970). *See Meadville Master Antenna, Inc. v. FCC,* 535 F.2d 214, 220 (3d Cir. 1976); *Action for Children's Television v. FCC,* 183 U.S.App.D.C. 437, 447–448, 564 F.2d 458, 478–79 (1977). With respect to the claims raised by the Coalition, we should reverse a decision of the Commission only if we find it "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing the interpretation of section 307(b) of the Communications Act, we also note that courts have traditionally deferred to the Commission's construction of its governing statute. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Office of Communication of the United Church of Christ v. FCC,* 150 U.S.App.D.C. 339, 344, 465 F.2d 519, 524 (1972).

■ First, we find that the Commission is permitted to consider the existence of UHF channels in making its determination of equitable service under section 307(b). The FCC's current allocation policy was set forth in the *Sixth Report and Order, Television Assignments,* 41 F.C.C. 148 (1952). In that report the Commission decided that VHF and UHF channels should be con-

sidered as complementary services for general allocation purposes, 41 F.C.C. at 207, with due regard to the different propagation characteristics of the two types of channels. This utilization of VHF and UHF channels was approved in *Fort Harrison Telecasting Corp. v. FCC,* 116 U.S.App. D.C. 347, 324 F.2d 379 (1963), *cert. denied,* 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964). Thus, the Commission is permitted to find that UHF or VHF channels alone are sufficient to meet the statutory service requirements.

■ Second, we believe that the case law construing section 307(b) permits the Commission to rely on out-of-state stations to meet an area's service requirements. It is clear from the legislative history of the section, as amended in 1936, Pub.L. 74–652, 49 Stat. 1475, that Congress did not intend that each state have a right to a local television station. Instead, the Commission was entrusted with discretion to allocate stations without regard to political boundaries so long as the radio (and, for present purposes, television) *service* was equitably distributed. *See, e. g.,* 80 Cong.Rec. 6031–32 (1936) (remarks of Sen. Wheeler, sponsor of bill); H.R.Rep.No.2589, 74th Cong., 2d Sess. 3 (1936); S.Rep.No.1588, 74th Cong., 2d Sess. 3 (1936). *See generally Pasadena Broadcasting Co. v. FCC, supra,* 181 U.S. App.D.C. at 113, 555 F.2d at 1050.

■ While the Coalition has pointed out that "service" has been interpreted as consisting of both transmission and reception of broadcast signals, it recognizes in its brief that analysis under section 307(b) is not merely a matter of counting the number of channels received and the number of channels located in a given area. Transmission and reception are important only insofar as they are descriptive of the television "service" provided to an area. The lack of a transmitting station in a state or community relates to the requirements of 307(b) only when a local station would add a quality of service which is not duplicated by a

station located elsewhere.[11] *See Pasadena Broadcasting Co. v. FCC, supra,* 181 U.S. App.D.C. at 113, 555 F.2d at 1050; *Jupiter Associates, Inc. v. FCC,* 136 U.S.App.D.C. 266, 302, 420 F.2d 108, 144 (1969). Thus, equitable distribution of transmission facilities is not an independent test which the Commission must apply. The key to the analysis under section 307(b) is whether the service provided by television stations is adequately distributed to viewers in the several states and communities.

These two conclusions do not end our inquiry. The Coalition has argued that under the facts presented in this proceeding before the Commission, the service provided by out-of-state and UHF stations does not satisfy the requirements of section 307(b).

■ The record supports the Commission's conclusion that more service should be made available to New Jersey. Nevertheless, it also supports its conclusion that even without the special New Jersey service commitments imposed by this rulemaking, the service received in New Jersey from UHF channels and from stations licensed in New York City and Philadelphia is sufficient to meet the requirements of section 307(b). New Jersey receives a large number of signals, and the administrative record contains ample evidence that stations broadcasting into New Jersey have provided substantial coverage of the state's local news and public affairs. Thus, we find that the Commission properly found that its allocations are in accord with the Communications Act.

## III

■ In addition to its argument that the Commission violated section 307(b), the Coalition has raised several contentions that the rulings of the Commission in this proceeding did not follow the principles of reasoned decision-making. We hold that the

Commission did not act arbitrarily or capriciously and did not abuse its discretion. We have carefully examined all the arguments raised by the Coalition, but will comment only on the claim that the remedy imposed in this case is not reasonably related to the problem diagnosed by the Commission in the *First Report.*

In its *First Report,* the FCC found that New Jersey television service could and should be improved. In the next two reports, the Commission concluded that the best results could be achieved by a combination of the local service obligations owed to viewers by New Jersey UHF stations and the additional special New Jersey service responsibility imposed on New York City and Philadelphia VHF stations.

This remedy is a reasonable plan for improving New Jersey television service. Based on the record, the remedy adopted is accurately aimed at the problem of inadequate news and public affairs programming for the state. While maintaining its traditional posture of not interfering with the programming judgment of broadcasters, *see* 47 U.S.C. § 326; *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 120–21, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Action for Children's Television v. FCC, supra,* 183 U.S.App.D.C. at 449, 564 F.2d at 470, the Commission has elicited commitments from stations regarding the use of news personnel and equipment which are deliberately planned to focus greater attention to New Jersey affairs.

Further, we find that the record supports the Commission's rejection of the various other remedies considered, including "hyphenation," the relocation of Channel 7, and the establishment of permanent studios in New Jersey. Each of these proposals was designed to place a legal or economic incentive on one or more stations to provide better New Jersey coverage. The Commission properly concluded that its decision to

11. In contrast to the flexibility afforded the Commission currently with respect to the allocation of stations, from 1928 until 1936 radio stations were allocated among five national zones by a quota system, pursuant to the Davis Amendment of the Radio Act of 1927, Pub.L. No.70–195, 45 Stat. 373 (1928), *see Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co.,* 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933). This quota system was abrogated in 1936. Act of June 5, 1936, Pub.L. No.74–652, 49 Stat. 1475 (1936).

impose the legally obligatory special New Jersey service commitment is reasonably calculated to provide the same incentive. Also, instead of adopting one of the other proposals in order to overcome the physical barriers of distance which in the past might have impeded the coverage of New Jersey events by out-of-state stations, the Commission relied on the commitment of electronic news-gathering equipment by the stations to New Jersey. It found that this new technology would surmount the former physical impediments to effective coverage. This conclusion was fully supported by the administrative record.

Lastly, we note the Coalition's argument that the special requirement is unenforceable, since the only check on whether stations are fulfilling the needs of New Jersey is the triennial license renewal procedure. *See Third Report, supra,* 62 F.C.C.2d at 608–09; 47 U.S.C. § 307. We believe, however, that the Commission in this case should be permitted to rely on its own renewal inquiry to police the service requirement. *See Action for Children's Television v. FCC, supra,* 183 U.S.App.D.C. at 460, 564 F.2d at 481. The stations have made concrete commitments, in large part involving a promise to establish a particular service or to devote a specific number of hours of employee time to New Jersey. Compliance with this sort of quantifiable commitment is easily monitored by the Commission. *See also Brandywine-Main Line Radio, Inc. v. FCC,* 153 U.S.App.D.C. 305, 473 F.2d 16 (1972) (refusal to renew license at least in part for misrepresentation of programming plans), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

■ As an appeals court reviewing the result of this informal rulemaking proceeding, we are not to substitute our own judgment for the expertise of the Commission in examining the television service needs of an area and in selecting the course which might cure any deficiencies. *See Action for Children's Television v. FCC, supra,* 183 U.S.App.D.C. at 457–458, 564 F.2d at 478–79; *Basic Media, Ltd. v. FCC,* 182 U.S.App. D.C. 209, 211–212, 559 F.2d 830, 832–33

(1977); *Public Interest Research Group v. FCC,* 522 F.2d 1060, 1066 (1st Cir. 1975), *cert. denied,* 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976). Since we find that the Commission's analysis of the problems of New Jersey service and its choice of remedy were reasonable and not otherwise arbitrary, capricious, nor an abuse of discretion, we affirm the Commission's three reports and orders.

The petition for review will be denied.