# NATIONAL LABOR RELATIONS BOARD
## v. MALL TOOL CO.
### No. 7476.

Circuit Court of Appeals, Seventh Circuit.
March 20, 1941.

Rehearing Denied May 22, 1941.

Robert B. Watts, Gen. Counsel, and Sylvester Garrett, Counsel, NLRB, both of Washington, D. C., for petitioner.

David R. Clarke and John Harrington, both of Chicago, Ill., for respondent.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Petitioner seeks to enforce its order directing respondent (1) to cease and desist from unfair labor practices, (2) to reinstate employees found to have been discriminated against, (3) to make such employees whole for loss of wages, and (4) to post appropriate notices. The order was based upon a finding that respondent had interfered with, restrained, and coerced its employees in violation of Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), by threatening discharge of its employees and closure of its plant, if they did not refrain from activity in the union, which, for brevity, we shall designate as the Amalgamated, by declaring its opposition to unions, by locking out its employees, and by dominating and interfering with the formation and administration of another union, which we shall designate the Council. The Board found further that respondent on March 15, 1937, wrongfully locked out eight employees and ever thereafter refused to reinstate them, all in violation of Section 8(1) and (3) of the Act. Respondent insists that the

findings are not supported by substantial evidence and that the order is invalid and improper.

■ It is unnecessary to extend to any great length our discussion concerning applicability of the Act, 29 U.S.C.A. § 151 et seq., or the findings of fact as to unfair labor practices. Upon the undisputed facts, the Act is clearly applicable, under National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. N.L.R.B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014. Similarly, there is little question as to substantial evidence in support of the finding of unfair labor practices. Respondent, through its officials, maintained and repeatedly expressed hostility toward unions in general and openly discriminated against organizers of the Amalgamated. It determined that the most feasible method of discouraging union activity would be to close its plant, believing that a temporary shut-down would produce effective discouragement. A picket line formed in protest. The president of respondent talked to the picketers, saying "I see what this is all about,—the C. I. O. is behind it. I don't want to see any of you union men around here." He announced their discharge, telling them to "get their tools and get out." Respondent then wrote all employees that great uncertainty existed as to when the plant would reopen and that they should remove their tools. Simultaneously, however, the foreman was instructed to advise such employees as were not members of Amalgamated to disregard the letter. These instructions were obeyed. Eventually the plant reopened and at that time substantially all former members of Amalgamated who returned to work and had testified in the proceeding had terminated their union memberships. Some of them testified that when they returned, the president informed them that he would not have union men working in his shop.

Within thirty days after the plant reopened, a supervisory employee of respondent suggested creation of the Council. The president approved and furnished a pamphlet containing instructions upon setting up a union, which the foreman delivered to the organizer of the new association. And within another thirty days, respondent had entered into a contract with

the Council recognizing it as exclusive bargaining agent of the employees. However, the new union did not function actively for any extended period and, finally, in September, 1937, some of its officers resigned. Thereafter it seems to have relapsed into innocuous desuetude.

When the plant reopened, reinstatement was denied eight employees. Three of them had been singled out previously as leaders in labor union activity. Two of them had been in the picket line when the president attempted to discharge the picketers. The other three had resisted an attempt to induce them to leave the picket line and return to work. All except one participated in the picketing. There was substantial evidence that respondent had discriminated against these employees in violation of the act in that they had been locked out and denied reinstatement because of union affiliation and activity in behalf of the Amalgamated.

This short resume of some of the facts appearing in the record, to which the Board gave credence over and beyond controverting testimony, clearly indicates substantial evidence in support of the findings mentioned.

Of more serious import is the contention of respondent that the order is unfair and improper in that it directs that certain employees receive back wages from March 15, 1937, inasmuch as the charges were not filed until September 23, 1938 and the amended charge April 28, 1939. This lapse of time, coupled with the circumstances in the record, respondent insists, renders unreasonable this portion of the order.

Respondent directs our attention to the fact that the Board itself has quite generally ruled that it will order back pay only from time of the filing of the charges, if there is unreasonable delay in filing charges and no mitigating circumstances are shown. The record does not disclose that these eight employees were engaged in any negotiations with respondent between April, 1937 and the time of the filing of the charges in September, 1938. We find in the record no mitigating circumstances justifying the delay. The language of the Board in L. C. Smith & Corona Typewriters, Inc., 11 N.L.R.B. 1382, seems applicable: "Since such delay would otherwise unduly prejudice the respondent, and with a view to encouraging the prompt disposition of charges, we shall not award back pay to * * * for the period in which the union failed to file its charges, in the absence of any showing of mitigating circumstances for this delay."

Consistency in administrative rulings is essential, for to adopt different standards for similar situations is to act arbitrarily. Under such circumstances, affirmative orders violate administrative discretion and become punitive, rather than remedial measures, outside the scope of the Board's powers. Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. It is obvious that undue delay in filing charges may not only prejudice the employer but also tend to encourage employees to await in idleness with the expectation that no matter how long they delay filing charges, they will receive compensation for all time during which they have been quiescent. The legislation contemplates that a proceeding such as this shall promote the public welfare; not that it shall benefit private parties in respects unrelated to that welfare.

Respondent insists further that the Board had no authority to order reinstatement of the employees inasmuch as they had obtained substantially equivalent employment. Section 10, 29 U.S.C.A. § 160, empowers the Board to require such affirmative action as will effectuate the policies of the act. Section 2 (3), 29 U.S.C.A. § 152(3), defines an employee as any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice and "who has not obtained any other regular and substantially equivalent employment." In National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 106 F.2d 263 and Phelps Dodge Corp. v. N. L. R. B., 2 Cir., 113 F.2d 202, the court remanded the proceeding to the Board for further consideration of whether certain employees had obtained substantially equivalent employment. In the last mentioned case, the court observed that if they had obtained such employment they had thereby ceased to be employees subject to reinstatement. In Mooresville Cotton Mills v. N. L. R. B., 4 Cir., 94 F.2d 61, likewise, the court interpreted the act as contemplating reinstatement of only such employees as have not obtained other equiv-

alent employment. Compare National Labor Relations Board v. Waumbec Mills, 1 Cir., 114 F.2d 226, which seems to reason otherwise.

We recognize that a reinstatement order is not merely means of vindication or of restitution of private rights and that the policy of the act, in behalf of the public welfare, requires that coercive effects of discrimination upon all employees be dissipated by means of reinstatement, where the act so authorizes. Congress evidently intended to make it illegal for employers to discharge men for exercising their rights of self-determination of bargaining agents and to deprive an employer of any prestige he might hope for from ridding his organization of those who oppose his attempts so to destroy their right to organize. National Labor Relations Board v. American Potash & Chemical Corp., 9 Cir., 113 F.2d 232, 129 A.L.R. 874. But we are confronted by the express words of Congress; and one of the limitations upon the term employee in the statutory definition is that it shall not include one "who has * * * obtained any other regular and substantially equivalent employment." Consequently we must again deal with a question of fact,— whether the record discloses that these employees are within the definition.

Albert Rusich, recognized as a good workman, had been employed by respondent at 85 cents an hour. From June, 1937 to October, 1937, he obtained employment at the All Steel Company at 75 cents an hour. When the lay-off seemed imminent, after talking to his foreman, he left for California and there engaged in the poultry business. His testimony is that between October, 1937 and the date of the hearing, he had earned about $11.

Michael Rusich had been a turret lathe operator, receiving 60 cents an hour. After the lay-off, he obtained employment at 55 cents for five months; at 65 cents for two weeks, at 70 cents for 27 days, from different companies. From October, 1937 to June, 1938, he obtained part time work with still another employer, receiving compensation during that period of $436. He worked from October 21, 1938 to April 8, 1939, for the W. P. A., from April 8, 1939 to May 22, 1939, for a car company and from May 22, 1939 until the time of the hearing with the W. P. A.

Ludwig Trotter had been employed as a shaft winder at 70 cents per hour. Be-ginning May 1, 1937, he was employed by the Illinois Testing Laboratory at 55 cents per hour until June 15, 1937, when he entered the employ of Walker Vehicle Company at 65 cents an hour. He worked full time for about a year; thereafter his employment was irregular, amounting to less than one-half time.

Benjamin Eckardt had been a machinist and tool maker, receiving 80 cents per hour. He worked for a hardware company at 80 cents an hour, being laid off in August, 1937. From September 3, 1937 to August 15, 1938, he was employed by the Atlantic India Rubber Company at $40 per week as a foreman. From March 15, 1939 until the time of the hearing he was employed by the Ingersoll Steel and Disc Company at 80 cents an hour.

Albert Crnkovich had been a lathe operator at 45 cents an hour. He worked for five months for an Electric Specialty Company at 65 cents an hour. After enforced idleness, he worked irregularly for a pump company at 55 cents an hour. He received, for nine months, for his part time employment, $325. From September 8, 1938 to January 9, 1939, he worked for a cooperage company, receiving 25 cents hourly, and from April 6, 1939 until the time of the hearing, for the Pullman Company at 55 cents an hour.

Frank Cullitan, a milling machine operator, received 40 cents an hour. He obtained a position as a theater usher for a month at $26; then for six months, with a manufacturing company, at 45 cents an hour. He worked irregularly during February, 1938, and after April, 1938 received employment with the National Youth Administration as a trumpet player.

Ralph Lehman, a machinist, had received 55 cents an hour. From April, 1937 to June, 1938, he obtained employment at 65 cents an hour. After being laid off, he then worked independently, earning less than $20 a week as a welder.

Jerry Pavlovsky had been an inspector's helper at 40 cents an hour. He obtained work at another company during four different intervals, April 8 to June 18, 1937; July 2, to December 24, 1937, part time from January to July, 1938 and from September, 1938 to February, 1939.

We have recited this evidence so that it may be apparent upon what the Board based its order. We think it obvious that these facts furnish substantial evidence for the findings of the Board that

these men were employees within the meaning of the statute and might properly have been ordered reinstated. None of them, other than Benjamin Eckardt, can be said to have obtained regular equivalent employment. Eckardt, apparently, has received steady employment with responsible concerns at equally good or better wages and can no longer be considered an employee of respondent. He comes clearly within the exception of the statute defining as non-employees those who have been able to obtain regular equivalent employment. Respondent's contentions in this respect must be denied except in so far as they apply to Benjamin Eckardt.

In view of the unexplained delay, considering the Board's policy generally, the order should be modified to require back pay only for the period subsequent to the time of the filing of the charges in September, 1938. It should be modified likewise as to the requirement of reinstatement of Eckardt.

■ The Board should not have included any direction upon the part of respondent to disestablish the Council. That organization, admittedly, has long ago ceased existence. Just as we refuse to enjoin previously committed trespasses which have long since been discontinued and renewal of which there is, under the evidence, no threat or probability, so, in the absence of proof of reasonable ground for fear or probability of repetition of action long ago terminated or abandoned, we will not mandatorily direct affirmative action with reference thereto,—we will not approve a futile order to disestablish something which is not established or has no existence. This, we think, is in accord with the Supreme Court's reasoning in National Labor Relations Board v. Express Publishing Company, 61 S.Ct. 693, 85 L.Ed. ——, decided March 3, 1941.

■ The order further directs reimbursement of public bodies for compensation paid by them to employees ordered reinstated. This, under the decisions of the Supreme Court, is improper.

In the respects indicated the order is modified; in all others it is approved. An order of enforcement, to the extent of such approval, is entered.

Upon Petition for Rehearing.

In our opinion filed March 20, 1941, we held that Benjamin Eckardt, a former employee, having obtained regular equivalent employment with responsible companies, at equally good or better wages, could no longer be considered an employee of respondent and directed elimination from the order of the Board of the requirement of his reinstatement.

■ Since that time, on April 28, 1941, the Supreme Court of the United States has decided Phelps Dodge Corporation v. National Labor Relations Board, 61 S.Ct. 845, 85 L.Ed. ——. In view of that decision, our conclusion regarding Eckardt was in error. Consequently the opinion should be modified by elimination of the direction to modify that part of the Board's order requiring his reinstatement. This modification of the order is now withdrawn. In all other respects the original opinion stands without further modification and the petition for rehearing is denied.