WOKO, Inc., v. FEDERAL COMMUNI-
CATIONS COMMISSION.

No. 9021.

United States Court of Appeals
District of Columbia.

Argued Oct. 18, 1945.

Decided Jan. 21, 1946.

Writ of Certiorari Granted April 22, 1946.
See 66 S.Ct. 968.

GRONER, C. J., dissenting.

———◆———

Mr. William J. Dempsey, of Washington, D.C., with whom Mr. William C. Koplovitz, of Washington, D. C., was on the brief, for appellant.

Mr. Harry M. Plotkin, Assistant General Counsel, of Washington, D. C., with whom Messrs. Rosel H. Hyde, General Counsel, Benedict P. Cottone, Assistant General Counsel, and Philip Bergson, Counsel, all of the Federal Communications Commission, all of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and WILBUR K. MILLER and PRETTY-MAN, Associate Justices.

WILBUR K. MILLER, Associate Justice.

On September 28, 1942, the appellant, WOKO, Inc., applied to the Federal Communications Commission for a renewal of the radio station license held by it for the operation of its broadcasting facilities at Albany, New York. Under permits periodically procured this radio station has been operated in Albany for some fifteen years last past. After extended hearings concerning the application of September 28, 1942, the Commission declined to renew the license. This appeal followed under that section of the Communications Act, U.S.C.A., Title 47, § 402(b), which grants to an applicant for renewal of a broadcasting station license the right to appeal to this court from an adverse decision.

Prior to November 1930, Station WOKO was located, first at Peekskill, and later at Poughkeepsie, New York. The license was held by the Hudson Valley Broadcasting Company, a partnership composed of Harold E. Smith and Raymond M. Curtis. Under authority granted by the Commission, the station was moved to Albany on November 25, 1930, and, shortly thereafter, the license was assigned by Smith and Curtis to the appellant. Early in 1931 broadcasting was begun at Albany.

While the station was at Poughkeepsie its operation was not profitable, and Curtis suggested that the license be surrendered. Smith thought it possible that a network affiliation might solve the financial difficulty. Accordingly, he visited the Columbia Broadcasting System at New York, where he met Sam Pickard, a vice president in charge of station relations. Pickard advised that CBS would not be interested in the station at Poughkeepsie, but suggested that if it were removed to Albany CBS would be interested in having WOKO as an affiliate.

Smith went to Albany and conferred with The Press Company, the publisher of the Albany Evening News and the Knickerbocker Press, with the purpose of interesting that company in the enterprise and obtaining financial assistance from it, as Curtis had tired of his losses at Poughkeepsie and was unwilling to finance the station further. The newspaper people agreed to aid, and it was determined that a corporation should be organized with one thousand shares of capital stock, seven hundred fifty shares to be divided equally between Smith and Curtis and the remaining two hundred fifty shares to be held in the treasury under the option of The Press Company to purchase it. The corporation was organized on December 9, 1930, The Press Company endorsed for it a note to the extent of $35,000, the shares of the capital stock were issued as planned, and the station began to operate at Albany early in 1931. Pickard performed his promise to aid in obtaining a CBS affiliation agreement, and assisted also in other ways. At one of his conferences with Smith, Pickard suggested that he be given an interest in the appellant corporation. It was finally agreed that he have twenty-four per cent of the capital stock and, pursuant to this agreement, on October 23, 1931, Smith and Curtis transferred of record to Pickard a total of one hundred forty shares, and, at his suggestion, to

Lawrence Lowman, another vice president of CBS, a total of one hundred shares. These certificates were endorsed by Pickard and Lowman and then delivered to The Press Company to serve as a part of the collateral securing its endorsement. In August 1932, the appellant's loan had been paid and the two hundred forty shares of stock in the names of Pickard and Lowman were released from the pledge and transferred of record to Pickard's wife. On February 2, 1933, the certificates evidencing the same two hundred forty shares, having been endorsed by Mrs. Pickard, were reissued to Smith, endorsed by him in blank and forwarded to Pickard. Smith continued as the owner of record of that block of two hundred forty shares until June, 1934, when, at the request of Pickard, he assigned eighty shares each to Mrs. Pickard and two holding companies controlled by the Pickards.

Sam Pickard had been a member of the Federal Radio Commission before he became a vice president of Columbia Broadcasting System. When he first asked for and obtained an interest in WOKO, Inc., he requested of Smith that his ownership in the station be kept secret, on the ground that he would be personally embarrassed if his associates at CBS should learn of it. He also informed Smith that there would be no need to disclose his ownership to the Federal Radio Commission, as that Commission was interested only in knowing whether or not any of the stockholders were aliens. Smith agreed to protect Pickard in that respect and did not disclose to the Radio Commission the fact that Pickard was a stockholder. In 1934, however, when more searching inquiries were made concerning stock ownership by the forms required to be filed with the Communications Commission, Smith notified Pickard that he must divest himself of the stock and that, failing that, he (Smith) would divulge the facts to the Commission. As a result of this ultimatum, Pickard informed Smith that he had decided to give the two hundred forty shares to his wife's brother-in-law, R. K. Phelps, an assistant United States attorney at Kansas City. Mrs. Pickard and the two holding companies, the record owners of eighty shares each of the block of two hundred forty shares in question, endorsed and surrendered the certificates and a new certificate for two hundred forty shares was issued on July 2, 1934, in the name of R. K. Phelps.

The stock has remained in his name on the corporate records since that time and has been so represented to the Commission.

When the Commission received on October 1, 1942, the appellant's application for a renewal of its license, dated September 28, 1942, it designated the matter for hearing and specified the following issues:

"(1) To determine whether the representations and statements made to the Commission or its predecessor, the Federal Radio Commission, by the licensee, its officers, directors, stockholders, or agents, with respect to the ownership or transfer of, subscription to, or consideration paid for the stock of WOKO, Inc., truly and accurately reflect the facts.

"(2) To determine all the circumstances and conditions under which the stock of WOKO, Inc., has been issued, transferred, or assigned.

"(3) To determine whether or not the applicant is qualified to continue the operation of Station WOKO.

"(4) To determine whether, in view of the facts adduced under the foregoing issues, public interest, convenience, and necessity would be served by a grant of this application."

There followed then a period of rather intensive investigation by the Commission, which included visits to Albany and Kansas City by a member of the Commission's legal staff. On June 26, 1943, the appellant petitioned the Commission to amend and enlarge the issues by including the following:

"1. To determine the nature, character and extent of the program service rendered by Station WOKO in the past, as well as that which is proposed to be rendered in the future.

"2. To determine the nature, character, and extent of the activities and/or policies of the licensee, its officers, directors, stockholders, agents, and/or employees, with respect to the operation of the station, the public service rendered thereby, and the response of the public to such activities and/or service in the past, and the proposals for future policies, activities and operation."

The Commission declined to amend and enlarge the hearing issues on the ground that those originally designated were "broad enough to permit, within reasonable bounds, the introduction of the evi-

dence suggested by the proposed issues of the petitioner."

Hearings were held in July, August and September, 1943, at which evidence of many witnesses was received and numerous exhibits were filed as parts of the record. It developed that Smith and Curtis each held twenty-five and one-half per cent of the capital stock of the appellant, that The Press Company had exercised its option in 1932 to purchase twenty-five per cent of the stock for $25,000, and that the remaining twenty-four per cent had stood in the name of R. K. Phelps on the corporation register since July 2, 1934. Phelps testified that he knew nothing of the transfer of the stock to him, that he was not and had never been the actual owner of it and that he had been imposed upon by Pickard in that respect. It appeared that dividend checks regularly had been issued by the corporation to Phelps and had been addressed to him in care of Pickard, and that Mrs. Pickard had endorsed Phelps' name to the checks, then had placed thereon her own endorsement and had accounted for the dividends in her personal income tax returns. Certain waivers of notice of meetings, with Phelps' name signed to them, were sent to the appellant, but it appears that they were signed by Mrs. Pickard. Mrs. Phelps, sister to Mrs. Pickard, testified that she intercepted pieces of mail from WOKO, Inc., addressed to her husband and did not bring them to his attention.

■ It appears clearly from the evidence that the Pickards received the dividends on the two hundred forty shares of stock, and the Commission's conclusion that they were the beneficial owners of it throughout the entire period in question is well grounded in the evidence. Smith testified that he believed Phelps to be the owner until he was advised otherwise by Pickard's letter of June 15, 1942. Pickard said that he did not inform Smith of the actual fact with respect to beneficial ownership until he wrote that letter. Nevertheless there is enough in the record to justify the conclusion of the Commission that Smith knew, or should have known, that Phelps was not actually the owner of the stock. So, it may be treated as established by the evidence that Smith, in making reports and applications for the appellant from 1934 to 1942, gave the Commission only the name of the record owner of two hundred forty shares of stock, and withheld the name of the beneficial owner, which he knew, or should have known.

The Commission did not find that this concealment of fact had influenced it in making any decision throughout the years involved, nor did it find that it would have acted in any manner differently from the way it did act on the various applications for renewal of license, had it known that the Pickards were the beneficial owners of these shares of stock. The Commission did not find that the Pickards were aliens or that they were disqualified in any way to own the number of shares of the appellant's stock which they beneficially owned. Indeed, such findings could not have been made by the Commission because there is no evidence upon which it could have based them.

There is no finding that Curtis, who owned twenty-five and one-half per cent of the appellant's capital stock, and The Press Company, which owned twenty-five per cent of the appellant's capital stock, had any part in, or knowledge of, Smith's concealment of the Pickard interest. It does appear that Curtis and The Press Company knew of the original issue of two hundred forty shares to Pickard or his nominee, but there is no suggestion that either participated in or knew of Smith's deception.

Having found that the appellant had failed to reveal to it and to its predecessor, the Federal Radio Commission, the fact of the Pickards' beneficial ownership of two hundred forty shares of stock, the Commission proceeded to the conclusion that the appellant "cannot be entrusted with the responsibilities of a licensee." The findings close thus:

"The Commission, therefore, finds that a grant of the application for renewal of the license for the operation of WOKO by the appellant corporation would not serve public interest, convenience, or necessity and therefore should be denied."

The question posed by this appeal is whether it clearly appears that this finding of the Commission is arbitrary or capricious, for the statute provides (U.S. C.A., Title 47, § 402):

"That the review by the court shall be limited to questions of law and that findings of fact by the Commission, if supported by substantial evidence, shall be conclusive unless it shall clearly appear

that the findings of the Commission are arbitrary or capricious."

This limitation of judicial review of decisions of the appellee is consistent with the general body of law concerning the finality of administrative proceedings. The Congress of the United States, which has plenary power to regulate the radio industry, has designated the Commission as its administrative agent, because it desired to have the regulatory work done by technically trained experts, skilled and experienced in the technical duties of radio regulation. The Congress defined the scope of the authority of its agent or, as is sometimes said, it established the standard according to which the agent should act. The broad scope of authority, or standard of action, established by the Communications Act is that public interest, convenience and necessity must be served. Within that framework the administrative agent is free to exercise its expert judgment; it cannot act unconstitutionally, for neither could its principal, the Congress, and the stream cannot rise higher than the source; it must proceed within the scope of the authority granted to it, that is to say, it must observe the standard established; and it cannot act arbitrarily or capriciously.

The broad sweep of the power given to the administrative agent to proceed according to a standard which necessarily is expressed in very general and widely inclusive terms proves how pertinent was the observation of Mr. Justice Justin Miller when he said, speaking for this court, that radio station licensees must be protected from arbitrary action of the Commission in the exercise of its regulatory power.[1]

Broad as the standard is, the Supreme Court has said that it is not so indefinite as to confer unlimited power.[2] The doctrine is that the act of the administrative agent is the act of Congress itself, as long as the agent stays within the boundaries of the standard and does not act arbitrarily or capriciously. Judicial review is limited, therefore, to the ascertainment of whether there has been an unconstitutional thing done by the agent, or whether the agent has exceeded its delegated authority by crossing the boundary of the standard, or has acted arbitrarily or capriciously.

Subject to the specific statutory provisions against the ownership or holding of radio station licenses by aliens, foreign governments or corporations which have an alien tinge through stock ownership,[3] the Communications Act simply directs the Commission to grant or renew a license if it shall find that public interest, convenience, or necessity will be served thereby.[4] It would be difficult, if not impossible, to formulate a precise and comprehensive definition of the term "public

---

[1] After showing that the Act does not recognize that licensees have any common law rights in radio broadcasting, this court in Yankee Network v. Federal Communications Commission, 71 App.D.C. 11, 107 F.2d 212, 217, said that nevertheless the Act does recognize certain *rights* of licensees and their ownership of their stations. The statute prohibits the use or operation of a broadcasting station except pursuant to a license and punishes as a criminal act the operation of such a station without a license. The opinion continues thus:

"It is apparent, therefore, that a radio broadcasting station is valueless without a license to operate it. It is equally apparent that the granting of a license by the Commission creates a highly valuable property right, which, while limited in character, nevertheless provides the basis upon which large investments of capital are made and large commercial enterprises are conducted. As it is the purpose of the Act to secure the use of the channels of radio communication by private licensees under a com-

petitive system, those licensees must be protected in that use, not merely from unlicensed stations and unlicensed operators, but from improper activities of licensed stations and operators, and from arbitrary action by the Commission, itself, in the exercise of its regulatory power."

[2] Federal Radio Commission v. Nelson Bros. Company, 289 U.S. 266, 285, 53 S. Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406.

[3] The Communications Act (U.S.C.A., Title 47, § 310) contains a provision that a radio station license shall not be granted to or held by an alien, nor by a corporation of which any officer or director is an alien or of which more than one fifth of the capital stock is owned of record or voted by aliens, as well as other restrictive provisions designed to keep the broadcasting service of the nation under domestic control.

[4] U.S.C.A., Title 47, § 307(a): "The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant

interest, convenience, or necessity," and it has been said often and properly by the courts that the facts of each case must be examined and must govern its determination.[5] It seems clear, however, that a decision of the Commission refusing to renew a license should not be allowed to stand if it appears that the Commission's prior and necessarily basic determination that public interest, convenience, or necessity will not be served by the renewal, was not properly reached; that is, that proper standards were not applied in reaching the conclusion that a renewal would not serve the public interest, convenience, or necessity, and thus that the conclusion reached was arbitrary or the result of caprice.

■ It is obvious that, in dealing with an application for the renewal of a license, the quality of the applicant's programs and the adequacy of the applicant's mechanical and scientific broadcasting facilities are principal among the elements to be considered. Concerning these particulars, although the Commission made no finding with respect to them, substantial and undisputed evidence in the record shows that Station WOKO consistently has rendered reasonably satisfactory service to its listeners and that it has not been guilty of delinquency in service which would support the conclusion that it should be denied a renewal of its license for that reason. Probably the principal concern which the general public has in Station WOKO is with the quality of the music and messages which it emits.

■ It should be remembered that the appellant sought the enlargement of the issues specified by the Commission to include the fundamental issue of the quality of its program service and the practical and technical excellence of its facilities and their operation. The Commission declined to make the suggested enlargement because it said that the issues originally announced by it were sufficiently broad to permit the introduction of evidence concerning those aspects of the case. It is perhaps not without significance that at the hearing the Commission's counsel objected to the introduction of evidence by the appellant intended to show that it had served its area well and that it is mechanically and scientifically equipped to do so. Although the trial examiner received the evidence, the Commission made no finding with respect thereto. On this appeal, it is the duty of the court to examine the evidence to see if it furnishes a substantial basis for the Commission's findings of fact, and to see if there is anything material in the evidence which should have been found by the Commission, but which is omitted from its findings. The latter is important because, if the administrative agent fails to find formally some relevant element of the factual situation, there is disclosed the beginning of an arbitrary or capricious conclusion.

■ The record reveals, not only that the Commission made no finding with respect to the quality of the appellant's service in the past and its equipment for good service in the future, but also that it failed to mention in its findings anything of the value of the property which its decision would render almost valueless. It failed to notice the innocence of Curtis and The Press Company concerning Smith's concealment of Pickard's stock ownership. These things we regard as being material. There is evidence in the record that in 1943 an offer of $75,000 was made for twenty-five per cent of the appellant's capital stock. This indicates the value of the stock owned by Curtis and The Press Company which will be largely lost to them should the Commission's decision stand.

■ When a broadcasting station has been constructed, necessarily at considerable cost, and has been maintained and op-

---

therefor a station license provided for by this chapter."

U.S.C.A., Title 47, § 309(a): "If upon examination of any application for a station license or for the renewal or modification of a station license, the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. In the event the Commission upon examination of any such ap-

plication does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe."

[5] Section 402(c) of Communications Act; Federal Communications Comm. v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656.

erated to the satisfaction of its listeners, it is ordinarily in the public interest that the station continue to operate, and a renewal of its license should not be refused unless there exist as a basis for the refusal what this court has called "compelling reasons." Those reasons must be such as bear on the interest of the public, or such as have effect upon its necessity or its convenience; nothing less can be "compelling," and on no other ground does the statute authorize the Commission to deny the renewal.[6]

▮ Under the authority of the Communications Act, Section 312, Title 47 U.S.C.A.,[7] a station license may be revoked by the Commission for false statements, either in the application or in the statements of fact which may be required under Section 308, or because the statements of fact revealed conditions which would have justified the refusal of a license in the first instance. It may be said, therefore, that the Commission may refuse to renew a license for any similar reason. It seems to us, however, that it is impossible to dissociate the provisions of Section 312 from those of Sections 307 and 309.[8] The latter two sections contain the broad standard that the public interest, convenience, and necessity must be served; and the Commission is directed to grant a license or a renewal, once it appears that the public will be served in those particulars. So, a station license may not be revoked, under the authority of Section 312, for a false statement in the application, unless in exercising a sound discretion the Commission should decide that, because of such false statement, the public interest, convenience, or necessity would be served by a revocation of the license. In reaching such a decision, the Commission must weigh, as it apparently heretofore has done consistently, the competing considerations which enter into the determination of the question whether the public interest, convenience, or necessity would be served by a revocation. Any other construction of Section 312 would arm the Commission with arbitrary power to revoke a license for the most inconsequential misstatement by the licensee.

▮ For all the foregoing reasons we conclude that the Commission does not have the power, implied from the provisions of Section 312 or otherwise, to refuse to issue a renewal license because of mis-

---

[6] Journal Co. v. Federal Radio Comm., 60 App.D.C. 92, 48 F.2d 461; Chicago Federation of Labor v. Federal Radio Comm., 59 App.D.C. 333, 41 F.2d 422.

[7] U.S.C.A., Title 47, § 312(a): "Any station license may be revoked for false statements either in the application or in the statement of fact which may be required by section 308 of this title, or because of conditions revealed by such statements of fact as may be required from time to time which would warrant the Commission in refusing to grant a license on an original application, or for failure to operate substantially as set forth in the license, or for violation of or failure to observe any of the restrictions and conditions of this chapter or of any regulation of the Commission authorized by this chapter or by a treaty ratified by the United States: Provided, however, That no such order of revocation shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed revocation, has been given to the licensee. Such licensee may make written application to the Commission at any time within said fifteen days for a hearing upon such order, and upon the filing of such written application said order of revocation shall stand suspended until the conclusion of the hearing conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of revocation."

[8] U.S.C.A., Title 47, § 307(a): "The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter."

U.S.C.A., Title 47, § 309(a): "If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. In the event the Commission, upon examination of any such application does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe."

statements of the licensee, unless those misstatements are of such moment as to outweigh all competing considerations, and logically and rationally to give rise to the conclusion that the public interest, convenience, and necessity would not be served were the license renewed. In other words, the guiding star of the Commission concerning the issue of a station license or a renewal thereof is fixed by the statute as the service of the interest, convenience or necessity of the public. Every specific grant of authority to the administrative agent of the Congress must be used so as to contribute to that service, or it will be correctly characterized as arbitrary, if hurt results to anyone.

 Its decision in the present case constitutes a departure from the course which the Commission has taken in dealing with misstatements in applications in other cases. It has not heretofore considered itself bound to refuse to issue a license or a renewal because of misstatements in applications; on the other hand, it has followed the practice of weighing all the elements of each situation presented to it in deciding whether the public interest would or would not be served, were a license or a renewal granted.[9] The doctrine of stare decisis does not apply to decisions of administrative bodies such as the Communications Commission, but radical departures from administrative interpretation consistently followed cannot be made except for most cogent reasons. Indeed it has been said that the adoption by an administrative agency of different standards for similar situations amounts to acting arbitrarily.[10]

The Navarro case (8 F.C.C. 198) is an illustration of the manner in which the Commission heretofore has interpreted the statute as to its duty in dealing with misstatements made by applicants for licenses. The Commission revoked the license of Navarro but, after a hearing had subsequent to the order of revocation, set aside that order. The finding was that the applicant had misrepresented its purpose as to the financing, construction, control, and operation of the station, in obtaining the original construction permit and station license. The Commission also found that the members of the original partnership which obtained the construction permit and initial license, had transferred those rights to Ulmer and Terry without the consent of the Commission and in violation of the Act. But, because Ulmer and Terry relinqushed their rights to others who proceeded to operate the station in the interest of the public and in full compliance with official regulations, the Commission concluded that "there is nothing in this record to indicate that the respondents, if permitted by this Commission, will not continue to operate in the public interest as they have done since November 1937." The opinion of the Commission then adds the following statement:

"In determining whether to revoke the license of a radio-broadcast station for false representations to the Commission and other violations of the Communications Act, the Commission is faced with competing considerations. The Commission's primary duty is to the listening public and, in dealing with a licensee, the Commission must be guided by this primary duty. On the other hand, if the Commission is to carry out its function of granting and denying applications for licenses, it must obtain true and accurate information from those who seek to operate radio stations and must take disciplinary action against those who make false representations to the Commission. But discipline should not be inexorably applied when station licensees demonstrate to the Commission, as these respondents have now done, that they are ready to act in good faith.

"To revoke their license at this time would deprive the community of the service of this station when there is no reason to believe that the respondents will not continue to operate it in the public interest."

In the case at bar, in a petition for rehearing, the applicant proposed a complete corporate reorganization of WOKO, Inc. The suggested plan included the resignation of all officers and directors who had served as such theretofore; the Phelps stock and other shares aggregating fifty-one per cent were to be held by a new cor-

---

9 Navarro Broadcasting Association, 8 F.C.C. 198; Red Lands Broadcasting, 8 F.C.C. 473; In the matter of Panama City Broadcasting Company, 9 F.C.C. 208.

10 National Labor Relations Board v. Mall, 7 Cir., 119 F.2d 700.

poration controlled by prominent Albany citizens, and such shares as Smith and Curtis would have left were to be placed in a voting trust under the terms of which those individuals would have no voice in a stockholders' meeting. This arrangement, had it been consummated, would have fit into the reasoning of the Commission in the Navarro case, when it is remembered that the mechanical, scientific and program excellence of the station is not challenged. But the Commission denied the petition for rehearing and adhered to its refusal to renew the license, and so departed from its policy of weighing the "competing considerations" in an effort to find what course will best serve the interest, convenience, or necessity of the public.

Moreover, common justice to the owner of the station, who has devoted a considerable investment to serving the public, requires that for no reason less than a "compelling" one should · his physical property be rendered valueless except for what it may bring at a sacrificial sale. It is true, as the appellee points out, that by the terms of the Communications Act, a station license does not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof, nor in any other manner than authorized therein. In spite of the absence of a vested property right in the continuance of the license, however, the Commission may not destroy or diminish the capital investment of the licensee by withholding a renewal of the license, unless in the exercise of a sound discretion it decides that the public interest, convenience, or necessity requires that such a drastic step be taken. The case of Journal Co. v. Federal Radio Commission, 60 App.D.C. 92, 48 F. 2d 461, 463, was one in which a radio station had been affected injuriously by the assignment of its frequencies to another station. In the course of the opinion Judge Robb, speaking for this court, said:

"The installation and maintenance of broadcasting stations involve a very considerable expense. Where a broadcasting station has been constructed and maintained in good faith, it is in the interest of the public and common justice to the owner of the station that its status should not be injuriously affected, except for compelling reasons."

If a station should not be injuriously affected save for compelling reasons, certainly it should not be destroyed by a refusal to renew its license for reasons that are less than compelling.

To the same effect is the opinion of this court by Chief Justice Martin in Chicago Federation of Labor v. Federal Radio Commission, 59 App.D.C. 333, 41 F.2d 422, 423. The appellant there was applying for a frequency of 770 kilocycles, which already had been granted to Stations WBBM and KFAB. The Commission refused to grant that frequency to the appellant because to do so would have denied the use of it to the two stations already using it. This court affirmed the action of the Commission and said:

"It is not consistent with true public convenience, interest, or necessity, that meritorious stations like WBBM and KFAB should be deprived of broadcasting privileges when once granted to them, which they have at great cost prepared themselves to exercise, unless clear and sound reasons of public policy demand such action. The cause of independent broadcasting in general would be seriously endangered and public interest correspondingly prejudiced, if the licenses of established stations should arbitrarily be withdrawn from them, and appropriated to the use of other stations. This statement does not imply any derogation of the controlling rule that all broadcasting privileges are held subject to the reasonable regulatory power of the United States, and that the public convenience, interest, and necessity are the paramount considerations."

Simply stated, the question in this case is whether it is logical and rational to say that a licensee cannot be entrusted with further responsibilities for the sole reason that, over a term of years, one of its officers has concealed from the Commission the identity of a beneficial owner of twenty-four per cent of its capital stock. It is conceded that the stockholder whose identity was not revealed was not an alien and, therefore, not disqualified by the express provisions of the statute. It does not appear, as pointed out above, that the concealment influenced or induced the Commission's action in granting license renewals heretofore, nor that the Commission's past decisions which granted renewals would have been different had the identity not been concealed.

The denial of the renewal because of the applicant's failure to show the beneficial ownership of twenty-four

per cent of its capital cannot be justified as a penalty for making false statements. The Act does not confer upon the Commission any punitive jurisdiction, and a license or its renewal may not be withheld in order to punish an applicant for violating the Act or a rule or regulation of the Commission. Such violations are to be punished only by the imposition after conviction, of the heavy fines imposed by Sections 501 and 502 of the Act. Nor does the Commission claim the right to punish, but on the contrary disavows any punitive intent here.

So it is manifest that the Commission's decision must depend for validity on the rationality of the step, directly and without any other consideration, from the Commission's well-grounded finding that the real beneficial owner of twenty-four per cent of the stock had been concealed from it, to the conclusion that the appellant "cannot be entrusted with the responsibilities of a licensee," and the consequent additional conclusion that the renewal license would not serve the public interest, convenience, or necessity.

 We are unable to agree that the step can logically be taken. Other elements must necessarily be weighed. Certainly the conclusion cannot be upheld as a penalty, for the reason stated heretofore; but the conclusion that the denial of the renewal license was penal in nature and so intended by the Commission cannot be escaped, for the appellant is the same corporation now which for fifteen years consistently has furnished adequate and satisfactory broadcasting service to its public, and has in all respects met the requirements of law and regulation except in the concealment of stock ownership upon which the Commission based its action. The Commission was quite justified in feeling vexed at the deception, and perhaps would have been justified in seeking criminal prosecution of Smith or of the appellant itself; but to say that this concealment, which did not induce or influence its former grants of renewal licenses, alone supports a conclusion that public interest, convenience, or necessity would not be served by the renewal, is in logic a non sequitur. The high mechanical, scientific and artistic standards maintained by the station, and the highly penal result of the deprivation of a license for a continuance of operation, are necessary considerations in the formation of a judgment as to public interest, convenience, or necessity.

 Under the situation disclosed here, we conclude that the Commission acted arbitrarily in proceeding from its warranted conclusion that the stock ownership had been misrepresented to it, to the drastic decision that the continuance of the license would not be in the public interest, with the concomitant results of disestablishing an established and satisfactory radio station and of imposing upon its corporate owner the entire loss of its good will and the serious impairment of the value of its capital assets.

Reversed.

GRONER, C. J. (dissenting).

I regret that I am not in accord with the conclusion reached by the majority. I do, however, very heartily agree with the view that this is a hard case. The Commission's drastic order, terminating the life of the station, punishes the innocent equally with the guilty, and in its results is contrary to the Commission's action in several other comparable cases. But that the making of the order was within the discretion of the Commission, I think is reasonably clear.

Shortly stated, the record shows that WOKO, Inc., acting through its General Manager, who ever since its organization has represented it in all of its transactions with the Commission, deliberately misled the Commission by repeatedly misstating the beneficial ownership of twenty-four per cent (24%) of its capital stock. What, if anything, would have happened if the truth had been disclosed is, in my view, not material.

The case, as I think, turns rather upon the question whether the statutory power of the Commission to determine public interest, convenience or necessity is broad enough to authorize the rejection of a license for renewal for repeated false swearing in statements of fact required to be filed by the Commission's rules and regulations.[1] An affirmative answer to the question seems to me to be obvious on the grounds of public policy and, accordingly, I do not stop to inquire whether the express statutory authority to revoke impliedly embraces also the power to refuse to renew.[2]

---

[1] 47 U.S.C.A. § 308.

[2] 47 U.S.C.A. § 312.