UNITED STATES of America, Plaintiff,

v.

CROCKER–ANGLO NATIONAL BANK, Citizens National Bank, and Transamerica Corporation, Defendants.

Civ. A. No. 41808.

United States District Court
N. D. California, S. D.

Oct. 6, 1966.

See also D. C., 223 F.Supp. 849.

Lyle L. Jones, Herbert G. Schoepke and Lawrence Jolliffe, Antitrust Department, San Francisco, Cal., for the United States.

Richard Archer, John P. Austin, Samuel H. Rindge and Douglas C. White, San Francisco, Cal., for defendants Crocker-Anglo National Bank and Citizens National Bank.

Christopher M. Jenks and Ralph C. Walker, San Francisco, Cal., for defendant Transamerica Corporation.

Charles H. McEnerney and Jos. J. O'Malley, Washington, D. C., for intervenor James J. Saxon, Comptroller.

Webster Clark and R. J. Hecht, San Francisco, Cal., for intervenor State of California.

## OPINION AND ORDER

Before POPE, Circuit Judge, SWEIGERT and ZIRPOLI, District Judges.

POPE, Circuit Judge.

On May 13, 1963, some 34 days prior to the decision of the United States Supreme Court in United States v. Philadelphia Nat. Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (June 17, 1963), the Crocker-Anglo National Bank of San Francisco and Citizens National Bank of Los Angeles applied to the Comptroller of the Currency for permission to merge, under the charter of the former, with the title "Crocker-Citizens National Bank". After notice and public hearing held July 30 and 31, 1963, and receipt of some 1605 pages of testimony and exhibits, the Comptroller, on September 30, 1963, made a decision approving the proposed merger, subject to certain named conditions, based on his findings including the finding that the proposed merger would promote the public interest. The approval was to be effective on or after November 1, 1963. On October 8, 1963, this suit was filed attacking the proposed merger as unlawful under § 7 of the Clayton Act, (15 U.S.C. § 18) and § 1 of the Sherman Act, (15 U.S.C. § 1). A certificate under the Expediting Act (15 U.S.C. § 28) was filed and pursuant thereto a three-judge court was named and assembled for the purpose of hearing the cause. The Government's application for a preliminary injunction was denied (United States v. Crocker Anglo Nat. Bank, D.C., 223 F.Supp. 849) and after completion of extensive pretrial proceedings and the making of a pretrial order the cause came on for trial on the merits. The trial began June 1, 1965, and the taking of testimony was concluded on June 18, 1965, with orders fixing the time for filing of briefs and proposed findings by the parties.

While the court was thus in the process of hearing testimony, on June 11, 1965, the Senate passed, with no opposing vote, its S.1698, a bill under whose provisions, if enacted, this case would have become moot, for, as stated in the report accompanying the bill, the bill "would free the banks involved in such suits from further proceedings under the antitrust laws." Whether it was because of their knowledge of the pendency of this legislation or otherwise, counsel by stipulation postponed the final filing of briefs and proposed findings until shortly before the passage of this proposed legislation, as amended in the House on February 9, 1966. The enactment, designated Public Law 89–356, 80 Stat. 7, was signed by the President on February 21, 1966.

The court was thus confronted with a somewhat extraordinary situation in which the law applicable to the case was changed after the testimony had been received and the cause submitted for decision. The measure, as finally enacted, made specific reference to this and other

cases similarly situated in § 2(c) thereof which provides as follows: "Any court having pending before it on or after the date of enactment of this Act any litigation initiated under the antitrust laws by the Attorney General after June 16, 1963, with respect to the merger, consolidation, acquisition of assets, or assumption of liabilities of an insured bank consummated after June 16, 1963, shall apply the substantive rule of law set forth in section 18(c) (5) of the Federal Deposit Insurance Act, as amended by this Act." [1] The so-called "substantive rule of law set forth in § 18(c) (5)" is stated in the Act as follows: "(5) The responsible agency shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served."

That language refers to the tests to be applied, in a case of this type, by the Comptroller of the Currency in passing upon an application for approval of a proposed bank merger. Not only did § 2(c), quoted above, specifically direct that this court, in respect to this case, "shall apply the substantive rule of law set forth in § 18(c) (5)" but § 18(c) (7) (B) provided as follows: "In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground that the merger transaction alone and of itself constituted a violation of any antitrust laws other than section 2 of the Act of July 2, 1890 (section 2 of the Sherman Antitrust Act, 15 U.S.C. 2), the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5)."

After a special hearing conducted for that purpose evidence was received and the parties were granted time within which to file further briefs and memoranda expounding their views as to the action which the court should take in the light of the entire testimony and in view of the new enactment.

It is the Government's view that the new statute made no substantial change in the law or standards to be applied in passing upon the issues here presented. The Government puts it thus: "It is, of course, the essential position of the Government * * * that the 1966 amendment to the Bank Merger Act (P.L. 89–356; 80 Stat. 7) has not resulted in substantial change in substantive antitrust law or in the standards used by the courts in determining the legality of bank mergers."

■ The new enactment does pose some difficult questions which we shall note hereafter. But we find no difficulty in concluding that the new enact-

---

1. It was noted in the congressional debates that this section referred to three so-called "post Philadelphia cases—in Nashville, San Francisco and St. Louis—where mergers were consummated after that [Philadelphia] decision." This is the San Francisco case there referred to. The Philadelphia case referred to is United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915. In that connection reference was also made to United States v. First Nat. Bank & Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1.

ment made substantial changes in the substantive law and in the standards to be applied in this case. Not only the language of the enactment but its legislative history is very compelling on this point. As we have noted, both § 2(c) and § 18(c) (7) (B), quoted above, specifically direct the court in this situation to apply the new standards of this Act. (The latter refers to the standards "directed to apply under paragraph 5" and § 2(c) and refers to these as "the substantive rule of law," set forth in that section.) It would be a bit startling to assume that in making this enactment, over which the congressional committees struggled long and hard, the Congress had turned up with nothing of substance, or had accomplished no change in respect to the law applicable for testing the validity of bank mergers.

The legislative history of the Act most emphatically contradicts the position now taken by the Government. The Senate Committee report, which accompanied the introduction of the bill in the Senate, took note of what Congress had contemplated would be the result of the Bank Merger Act of 1960. The Committee stated: "At that time it was clearly expected that the decision of the responsible Federal banking authority, based on its own investigation and on reports on competitive factors from the other two banking agencies and from the Department of Justice, would be final and conclusive. The Attorney General's report was expected to be advisory only." The report states that the uncertainty created by the situation resulting from the Philadelphia and the Lexington bank cases (supra note 1) "is harmful to the banking industry and to its customers. * * * There was unanimous agreement by all the witnesses that the present situation was undesirable and should be changed." The House Committee report states clearly the intent to make changes in the law as follows: "The intended

legal effect of the bill is to modify the foregoing provision in three respects:

First, it is intended to make clear that no merger which would violate the antimonopoly section (sec. 2) of the Sherman Anti-Trust Act may be approved under any circumstances.

Second, the bill acknowledges that the general principle of the antitrust laws—that substantially anticompetitive mergers are prohibited—applies to banks, but permits an exception in cases where it is clearly shown that a given merger is so beneficial to the convenience and needs of the community to be served—recognizing that effects outside the section of the country involved may be relevant to the capacity of the institution to meet the convenience and needs of the community to be served—that it would be in the public interest to permit it.

Third, the bill provides that this rule of law is to be applied uniformly, in judicial proceedings as well as by the administrative agencies."

The most complete exposition of the congressional view in the process of this enactment is to be found in the remarks of Senator Robertson at the time the bill, as amended to conform to the House Committee report, came back to the Senate. At that time Senator Robertson, who was Chairman of the Senate Committee which had charge of the bill and who originally introduced the bill in the Senate, was recommending that the Senate accept the House amendment. No member of Congress had remained in closer touch with the bill's progress through both Houses than Senator Robertson. As he put it: "I have lived with this problem day and night for months. I am convinced that we have a good bill." What he then had to say expounded at considerable length the ideas which had been expressed by various House members during consideration of the bill in the House.[2]

2. Representative Ashley, one of the members principally in charge of the bill in the House, stated (Cong.Rec. Feb. 8, 1966, p. 2339): "The bill would require the court to use the new standards of the bill in all * * * 'post Philadelphia' cases now pending in court. * * * The courts have repeatedly held that un-

Senator Robertson said unequivocally that the purpose of the bill was to "reverse a decision of the Supreme Court." He said (Cong.Rec. Feb. 9, 1966, p. 2538): "The bill will end the confusion and controversy which has surrounded the bank merger situation since the ill-advised and unfortunate decisions of the Supreme Court in the Philadelphia and Lexington cases and the district court decision in the New York case which followed those precedents. It will do this by establishing a uniform rule for the bank supervisory agencies and the courts to follow in bank merger cases: a rule which takes into account both the competitive factors on which the antitrust laws are based—for banks these were written into the Bank Merger Act of 1960—and the convenience and needs of the public to be served by the proposed merged bank." Referring to the pendency of the suit now before us, he said: "It would permit the continuance of proceedings against the three 'post-Philadelphia' cases—in Nashville, San Francisco, and St. Louis—where mergers were consummated after that decision, but in these three cases the courts would be directed to follow the new statutory standards laid down in the statute for all mergers to be considered in the future." And in a prepared statement which he incorporated in the record as a part of his remarks he said of the bill: "It will strike the Philadelphia, Lexington, and New York decisions and opinions from the books." [3]

der the antitrust laws the social or economic benefits of a given merger cannot even be considered." The Congressman then quoted from the statement to that effect in the Philadelphia case: "It is a primary purpose of the bill to assure that the courts will never again dismiss as irrelevant the question of the needs of a community * * *. [T]he merger must be shown to be sufficiently beneficial in meeting the needs of the community to be served that, on balance, it may properly be regarded as in the public interest." During the same discussion Rep. Stanton, a member of the committee in charge of the bill, (Cong. Rec. Feb. 8, 1966, p. 2343) stated: "[I]t was the expressed purpose and intent of Congress when it passed the Bank Merger Act in 1960 to make certain that control of bank mergers should be in the hands of the appropriate banking supervisory agencies, and that while the competitive effects of a proposed merger should be considered, they were not to be given a predominant position. These standards were repudiated by the Supreme Court in the Philadelphia National Bank and the Lexington Bank cases in which the Court decided that the Justice Department had the final say in bank mergers. Contrary to the intent of Congress, the bank regulatory authorities were relegated to advisory roles. * * *

These provisions * * * reinstate a measure of antitrust consideration which was lacking in the Senate bill, and they provide a banking standard that may allow economic assistance to a community even though a merger tends to lessen competition in that community. It is this statutory balance that was intended in 1960. * * *

The * * * bill * * * directs the courts to apply the banking standards as well as the competitive standards in any judicial proceeding attacking an approved merger transaction * * * it * * * gives these standards equal weight as between economic and competitive circumstances and it assures this equilibrium throughout the entire review procedure."

3. In an effort to find some legislative history to bolster its position that this Act made no changes in the law, the Government has inserted in its brief some quotations from the remarks of individual Congressmen during floor debate. Taken out of context, as they are, they prove nothing. It is true that the wording of § 18(c) (5) emphasized and restated the requirement that the Comptroller, and the reviewing courts, take into consideration the antitrust laws. This was noted in debate, but it was also noted that this Act definitely and positively added a new standard. As stated in the House Report of supplemental views of Congressman Ottinger who helped draft the bill: "It also assures that banking services available to meet the convenience and needs of a community are considered in all cases and will prevail where they clearly outweigh nonmonopolistic anti-competitive effects of a merger."

Counsel's quotations from the debate ignore the rule stated in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474–475, 41 S.Ct. 172, 179, 65 L.Ed. 349, as follows: "By repeated decisions of this court it has come to be well established

Perhaps the most conclusive evidence of the fact that this Act alters the previous rules comes from a comparison of the language of this statute with what the Supreme Court said in the Philadelphia case, namely, that a bank merger such as that one "is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." Section 18(c) (5), quoted above, expressly requires a consideration of similar factors thus rejected in Philadelphia.

This statute makes a further alteration in the nature of the proceeding now before us. After providing for the time of commencement of an action brought under the antitrust laws arising out of a merger transaction, § 18(c) (7) (A) stipulates: "In any such action, the court shall review *de novo* the issues presented." Returning now to the provisions of § 2(c), requiring this court to "apply the substantive rule of law set forth in § 18(c) (5)", and to § 18(c) (7) (B), reciting that in any judicial proceeding attacking a merger transaction approved under paragraph 5, "the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph 5," it seems clear that what we are now called upon to do is to review a decision and determination of the Comptroller of the Currency.

To what extent that review can be "*de novo*", we shall have occasion to discuss hereafter. The immediate difficulty now presented is that the prior decision of the Comptroller of September 30, 1963, was not made under or in the light of the new Bank Merger Act of 1966.

It is true that the Comptroller then found that the proposed merger "will promote the public interest", using the language of the 1960 Act, but his determination did not contain findings covering the precise issues required to be determined by him under the language of § 18(c) (5) quoted above. Under that section it would be incumbent upon the Comptroller to determine whether any anti-competitive effects of the proposed merger were "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." We apprehend that an appropriate finding would specify in what respect the transaction would meet the convenience and needs of the community to be served.

There is another respect in which the earlier finding of the Comptroller may be inadequate and out-dated. His decision of September 30, 1963, antedated the decisions of the Supreme Court in United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12, decided April 6, 1964, and United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775, decided June 22, 1964. In those cases the Supreme Court developed, to an extent not previously announced, the doctrine that § 7 of the Clayton Act is designed to preserve not merely present but potential competition in the market in question. This is the doctrine of the application of § 7 to potential competition. The principal argument made by

that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the lawmaking body. * * * But reports of committees of House or Senate stand upon a more solid footing, and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure. * * * And this has been extended to include explanatory statements in the nature of a supplemental report made by the commit-

tee member in charge of a bill in course of passage." Counsel have largely confined their quotations to those from Congressmen Weltner and Todd, who opposed the bill, and from Congressman Patman who bitterly fought the legislation and finally, through a face-saving compromise, introduced the bill, while stating that if he alone were writing the bill, he "would be against it as a matter of principle." (Cong.Rec. Feb. 8, 1966, p. 2357.) Counsel's choice of makers of remarks is not very persuasive.

the Government here relates to alleged elimination by the merger of *substantial potential competition* in the State of California.

The Act requires this court to proceed in this case in the same manner in which it would have to deal with some future proposed merger. Before we can perform the required function of reviewing the action of the Comptroller, the matter must be remanded for the consideration of the Comptroller under the provisions of the 1966 Act, a proposition we shall discuss hereafter.

Plainly enough the Act is designed to set up precise rules under which the validity of proposed bank mergers may be ascertained and determined. The first required step is the application to the Comptroller of the Currency[4] for written approval of the proposed merger. Upon hearing on such an application the Comptroller is directed to act upon the considerations set forth in § 18(c) (5) above referred to. Then, as indicated, if an action be brought attacking the merger transaction, it must be brought within a limited time and in any such action "the court shall review *de novo* the issues presented." Thus the Act contemplates initial action by the Comptroller followed by a review at the instance of the Department of Justice.

When we face the task of complying with these requirements we are confronted with a difficulty arising out of the fact that the Act provides that this review shall be "de novo".

It will be noted that under § 5 the Comptroller is charged with ascertaining two sets of facts. The first is whether the effect of the proposed merger transaction "in any section of the country may be substantially to lessen competition" and the second, whether, having found that there would be anticompetitive effects in the proposed transaction, those effects "are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served."

No difficulty would be presented here so far as reviewing *de novo* the first of these determinations for this court has traditionally adjudged whether mergers have anti-competitive effects. But the problem of reviewing the second determination by the Comptroller, namely, whether the proposed transaction is outweighed in the public interest, and whether it meets the convenience and needs of the community, is plainly and unquestionably a legislative or administrative determination[5] of a type which

---

4. It is this officer who must act if the acquiring, assuming or resulting bank is to be a national bank. Where a state bank is to be the resulting one, the decision is to be made by the Board of Governors of the Federal Reserve System. In other cases, the Federal Deposit Insurance Corporation is to make the decision.

5. It will be noticed that the standards of § 5 are to be applied in granting or refusing leave to merge in the future. The contemplated action "looks to the future and changes existing conditions by making a new rule, to be applied thereafter to * * * some part of those subject to [the Comptroller's] power," as fully as the establishment of railroad rates in Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150. It involves a determination and establishment of a public policy.

See Finfrock, "Trial de Novo—Panacea?" in 14 Baylor Law Review, 135, where the *Texas* cases are discussed: "This criterion in essence classifies as administrative and non-judicial decisional functions which courts are not particularly equipped to decide while leaving to the courts that category of decision making with which it has traditionally dealt and is equipped to handle under the adversary type of judicial procedure. Decisions that require the inquisitorial type of procedure, investigative in nature, and which must, to attain optimum utility, be based upon a mosaic of expert opinion, judgment, and decisions are and should be regarded as non-judicial and left primarily to the administrators. They are far more able to come to grips with such problems than a court or jury in the detached and sterile atmosphere of the courtroom." (p. 160)

this court, as a constitutional court, is prohibited from deciding.

The jurisdiction of this court is limited to cases and controversies as that term is used in Article III of the Constitution. As stated in Keller v. Potomac Electric Power Co., 261 U.S. 428, 444, 43 S.Ct. 445, 449, 67 L.Ed. 731, "legislative or administrative jurisdiction, * * * cannot be conferred" on a court such as this. This court, as well as the Supreme Court, "was brought into being by the judiciary article of the Constitution, is invested with judicial power only, and can have no jurisdiction other than of cases and controversies falling within the classes enumerated in that article. It cannot * * * exercise or particiate in the exercise of functions which are essentially legislative or administrative." Federal Radio Comm. v. General Electric Co., 281 U.S. 464, 469, 50 S.Ct. 389, 390, 74 L.Ed. 969. See also Federal Power Comm. v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15, where it was held that the authority of the Court of Appeals to affirm, modify or set aside an order of the Federal Power Commission did not include the power to exercise an essentially administrative function by determining what conditions should attach to a power license. We find an expression of the views of the Supreme Court on the precise question here involved in United States v. Philadelphia Nat. Bank, supra, 374 U.S. at page 371, 83 S.Ct. at page 1745. This view is to be found in the words which we have italicized in the following quotation: "We are clear, however, that a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. *A value choice of such magnitude is beyond the ordinary limits of judicial competence*, and in any event has been made for us already, by Congress when it enacted the amended § 7. Congress determined to preserve our traditionally competitive economy." (Italics ours)

■ This does not mean that the administrative order of an agency or commission may not be reviewed in a judicial proceeding in a constitutional court; but such a review is necessarily limited to the determination of questions of law and the ascertainment of whether findings of fact by the agency are supported by substantial evidence. Federal Radio Comm. v. Nelson Bros. Co., 289 U.S. 266, 275 to 276, 53 S.Ct. 627, 77 L.Ed. 1166. As stated in Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 157, 86 S.Ct. 277, 278, 15 L.Ed.2d 223, the question to be decided is "Whether the Commission has confined itself within the statutory limits upon its discretion and has based its findings on substantial evidence * * *."

■ Since it is plain that this court cannot be invested with power to make an original and independent determination as to whether anti-competitive effects are "outweighed in the public interest" or what are the "convenience and needs of the community to be served" we are confronted with the question whether this Act's provision for a review *de novo* must be held null and void and therefore wholly disregarded.

We do not think so. There are certain general principles relating to construction of statutes which should aid us here. In United States v. American Trucking Ass'ns, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063–1064, 84 L.Ed. 1345, the Court said: "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a

whole' this Court has followed that purpose, rather than the literal words."

In the case before us the use of the words "de novo", as we have noted, may have full significance in respect to this court's review of the Comptroller's determination of the existence or nonexistence of anti-competitive effects by the merger. But the language of the Act would lead to absurd and futile results if it were construed as requiring this Court to substitute its judgment for the findings of the Comptroller dealing with the public interest and the convenience and needs of the community. This court cannot validly be invested with power to make such a decision which, as we have noted, is plainly legislative or administrative in character. If we look to the purpose beyond the statute and to the policy of the legislation as a whole we must conclude that Congress has framed an Act which contemplates, as an important part thereof, provisions for review of the Comptroller's action.

Other courts have had occasion to deal with an identical problem arising from the use of the words "de novo" in state statutes providing for court reviews of administrative or legislative determinations. In those cases the courts have been confronted with difficulties comparable to those present here, some of them stemming from their constitutional provisions for separation of powers. Thus in Household Finance Corp. v. State, 40 Wash.2d 451, 244 P.2d 260, 264, the court, after holding invalid an attempt to vest a non-judicial power in a constitutionally created court, said: "We recognize that there is a wealth of authority to support respondent's position that where the only review of an administrative order that is constitutionally possible is on the question of whether the administrative body or officer acted arbitrarily, capriciously, or in violation of law, it will be held that a provision for a trial *de novo* means only that the appellate or reviewing court will be limited to a consideration of that particular question on the trial *de novo*. The basis for such holdings is the rule

that when a statute is subject to two possible constructions, one of which will render it constitutional and the other unconstitutional, the legislature will be presumed to have intended a meaning consistent with the constitutionality of its enactment." (244 P.2d 264)

A like decision was made by the Supreme Court of Indiana in State Board of Medical Registration and Examination v. Scherer, 221 Ind. 92, 46 N.E.2d 602, 604, where the court said: "It is true that the statute here in question seems to contemplate a de novo proceeding before the court, and a finding of 'guilty' or 'not guilty,' but, regardless of what may seem a legislative intention to the contrary, this court has consistently construed similar statutes as vesting in the courts only such jurisdiction as the Constitution permits."

The same problem confronted the Supreme Court of Texas in Jones v. Marsh, 148 Tex. 362, 224 S.W.2d 198. In that case the court was called upon to review an order made upon an application for a license to sell beer. The statute provided for an appeal and that such proceeding on appeal "shall be *de novo* under the same rules as ordinary civil suits." The court said (p. 201): "The statute does not expressly provide that there shall be in district court a full retrial of the facts as if there had been no findings made by the county judge, nor does the statute specify what issue or issues shall be tried in the district court. It may, therefore, reasonably be concluded, in view of the subject matter involved and the nature of the order to be reviewed, that only a limited review is intended, and that in so far as the facts which are the basis for the order of the county judge are concerned the question or issue to be determined in the district court is whether or not the findings of the county judge are reasonably supported by substantial evidence. Such a trial is one kind of a trial de novo, and the somewhat limited trial can be held, as the statute requires, under the rules applicable to ordinary civil suits." In other words, the sort of trial which the

court could validly hold on review of an administrative order was held to be "one kind of a trial de novo." [6]

It seems reasonable to say that there may be a special kind of review *de novo* involved here, namely, a review involving a greater exercise of our judgment in respect to the question of anti-competitive effects, and a review, more limited under the so-called substantial evidence rule, of the Comptroller's determination of weight of public interest and of the character of the needs and convenience of the community.

Another general principle may therefore be applied here. Since the language of the Act could properly be construed to intend the special kind of *de novo* review just referred to, we can "apply the familiar canon which makes it our duty, of two possible constructions, to adopt the one which will save and not destroy. We cannot attribute to Congress an intent to defy the Constitution or 'even to come so near to doing so as to raise a serious question of constitutional law.'" Anniston Mfg.

Co. v. Davis, 301 U.S. 337, 351, 352, 57 S.Ct. 816, 823, 81 L.Ed. 1143. See also National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893, and Ex parte Mitsuye Endo, 323 U.S. 283, 299, 65 S.Ct. 208, 89 L.Ed. 243.[7]

It is plain to us that the congressional purpose here was to provide for an initial decision by the Comptroller and that the action brought by the Department of Justice should be deemed an action to review that decision. It is noteworthy that the section of the statute which uses the term "de novo" does not speak of a trial de novo but of a *review* de novo.

The legislative scheme here, in our view, resembles that which is more elaborately spelled out in those sections of the Interstate Commerce Act which were discussed in the recent case of Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223.[8] In that case the three-judge district court had set aside a commission's order approving a railroad merger on

6. A like problem was solved in a similar manner in De Mond v. Liquor Control Commission, 129 Conn. 642, 30 A.2d 547, 549, where the court said: "Upon these appeals the court hears and considers all pertinent matters for the purpose of reaching an intelligent conclusion as to the legal propriety of the action of the commissioners. In this qualified sense, but in no other, is its hearing one de novo." Another approach to a similar problem was made in American Beauty Homes Corp. v. Louisville etc., Ky., 379 S.W.2d 450, 455, where the court held that "the statute was invalid with respect to the trial 'de novo' but still permitted an aggrieved party to appeal. This also was the ruling in California Co. v. State Oil and Gas Board, 200 Miss. 824, 27 So. 2d 542, 28 So.2d 120, heretofore cited. We think the 'de novo' provision of KRS 100.057 is clearly severable from the rest of this statute."

7. In United States v. Philadelphia Nat. Bank, supra, the Court was confronted with a difficulty arising out of the language of § 7 of the Clayton Act. The Court recognized merit in the contention of the appellees that the merger there involved an assets acquisition and hence

that § 7 had no application since the Federal Trade Commission had no jurisdiction over banks. The Court said (374 U.S. p. 337, 83 S.Ct. p. 1727): "Since the literal terms of § 7 thus do not dispose of our question, we must determine whether a congressional design to embrace bank mergers is revealed in the history of the statute." The Court's final conclusion was based upon what it found to be a "plain congressional purpose."

8. During the debate in the House Congressman Moorehead, one of the members of the committee most actively in charge of the bill, cited and quoted from the Seaboard Air Line case, and also from McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544, as appropriate precedents for his point: "In the banking industry the public interest is represented and protected by a regulating body. In mergers in such a situation the custom is that the validity of a merger should be determined not exclusively by the competitive factors, but that the regulating body should also consider the public interest." Cong.Rec. February 8, 1966, p. 2340.

the ground that the commission had not adequately determined whether the merger violated § 7 of the Clayton Act. The Court said: "By thus disposing of the case, the District Court did not reach the ultimate question whether the merger would be consistent with the public interest despite the foreseeable injury to competition." The Court referred to its decision in Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 187, 80 S.Ct. 229, 238, 4 L.Ed.2d 223, where the Court described the impact of congressional legislation by saying "Even though such acquisitions might otherwise violate the antitrust laws, Congress has authorized the Commission to approve them, if it finds they are in the public interest * * *. It must be presumed that, in enacting this legislation, Congress took account of the fact that railroads are subject to strict regulation and supervision. 'Against this background, no other inference is possible but that, as a factor in determining the propriety of [railroad acquisitions] the preservation of competition among carriers, although still a value, is significant chiefly as it aids in the attainment of the objectives of the national transportation policy.'" The Court continued "Resolution of the conflicting considerations 'is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission "to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms." 79 Cong.

Rec. 12207. "The wisdom and experience of that commission," not of the courts, must determine whether the proposed [acquisition] is "consistent with the public interest." * * *.'"

■ The action of the Supreme Court in those cases dealing with the right of the Interstate Commerce Commission to approve a merger notwithstanding its anticompetitive effects, and particularly the language above quoted from the Seaboard Air Line case, would seem to negative another argument of the Government. This is that the language of § 18(c) (5) referring to the "convenience and needs of the community to be served" is but a reiteration of the "failing company doctrine" long recognized as "an integral part of settled antitrust law." No such limiting suggestion was ever made in Seaboard Air Line and the other cases dealing with the same statute. In our view it would be absurd to find that the new standards so carefully framed for the 1966 Bank Merger Act were no more than the inclusion of a wholly unnecessary reference to the "failing company doctrine". There is not the slightest indication in the language of the Act, or in its legislative history, to support the Government's effort thus to cancel or dissipate the declared purpose of the Act. During the debate on the bill, the question of the situation of the failing bank was mentioned, and in a colloquy between Congressman Weltner, who opposed the bill, and Congressman Multer, who supported it, it was made plain that the language referred to was not limited to the failing bank situation.[9]

9. After Congressman Multer had given an illustration of how this language would apply in a case not involving a failing bank, the following colloquy occurred:

"Mr. Weltner. This is a case of a failing bank, which has long been recognized by the court. It has nothing to do with this legislation. I am sure the gentleman from Wisconsin will agree with me, that we do not have to pass any bill to permit the approving agency to merge a failing bank in order to save it from insolvency. I am certain that the gentlemen from New York, indeed, would

say, as a well-educated lawyer, that the failing bank doctrine exists independently of any statutes which has been passed in the last 20 or 30 years. I yield to the gentleman for the purpose of responding to the correctness of that proposition.

Mr. Multer: The gentleman is correct as far as he goes, but I have gone beyond the failing bank theory. There are many instances where we are not concerned with the failing bank, where there is an absolute and complete diminution of competition, yet under all the circumstances and all of the factors the

The careful and precise description of this portion of the bill, made by Senator Robertson to the Senate as the latter body prepared to accept the House version, would clearly negative any suggestion that it was limited to the failing company situation.[10]

A final answer to the Government's "failing company" theory is found in the House Report's indication as to the limited extent of the use of financial resources of the affected banks. That report states (U.S. Code, Cong. and Administrative News, 89th Cong. 2d Session, p. 337): "However, only the convenience and needs of the community to be served can be weighed against anticompetitive effects, with financial and managerial resources being considered only as they throw light on the capacity of the existing and proposed institutions to serve the community."

One problem which we confront in this particular case is how we shall apply the rules which are prescribed in the Act. In the case of future mergers the method of procedure and the application of the statutory requirements is quite simple. First, the banks seeking to merge will make their application for approval to "the responsible agency" in a case of this kind, the Comptroller of the Currency. The agency will then hold the hearings and make the determination contemplated by § 18(c) (5) of the Act which, as we have indicated, calls for two determinations—whether the merger will have a tendency substantially to lessen competition and whether the anti-competitive effects, if found, are clearly outweighed in the public interest by the probable effect of the transaction in meeting the needs and convenience of the community to be served.

The Act then provides that any action brought under the antitrust laws arising out of this merger transaction shall be commenced within a short period following the Comptroller's approval and in this judicial proceeding "the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph 5." Also, in any such action, the court is required to review in the manner we have mentioned, the issues presented. The Act, making reference to this, and other cases initiated after June 16, 1963, with respect to a merger consummated after that date, requires us to apply the same substantive rule of law that we would apply in the case of any future merger.

Here, however, the merger is already accomplished; it was accomplished pursuant to a September 30, 1963, approval by the Comptroller who purported to act under the provisions of the 1960 Bank Merger Act. That Act, as demonstrated by the decision of the Court in Philadelphia Nat. Bank, supra, was without force and effect, and the Comptroller's decision of September 30,

court should approve that merger just as the regulatory agencies may approve the merger." Cong.Rec. Feb. 8, 1966, p. 2346.

10. He said: " * * * this bill, should convince the courts that the Congress does not intend that mergers in the banking field should be measured solely by the antitrust considerations which are applied in other industries." (Cong.Rec. Feb. 9, 1966, p. 2541.) In short, something apart from the older antitrust considerations, (including the failing company rule) are imported here. He also said (p. 2542): "The courts will no longer be able to say—in the case of a merger which does not reach to the point of creating a monopoly—that proof

that a merger will have demonstrable benefits or will be benign is irrelevant. On the contrary, the question whe,ther there are or are not demonstrable benefits—whether the merger is benign or malignant—will be the heart of the issue." Again he said (p. 2542): "The effect of the merger on the public interest and on the convenience and needs of the community to be served must be measured in specific and realistic terms in the light of the kinds of business involved, and the kinds of people being served. The banking agencies and the courts must be guided by the realities of the industrial, commercial, and financial worlds. They must look through theories and percentages and doctrines to the hard facts of life."

1963, cannot, we think, be the equivalent of a determination by him under the 1966 Bank Merger Act or in accordance with § 18(c) (5) thereof. The question is whether we may now require the Comptroller to proceed under the new Act and to make the determination called for by the last mentioned section preliminary to our further consideration of the same and a review thereof.

We think that the decision in United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211, furnishes a precedent.[11] The Court upheld the right of the Secretary of Agriculture to make an order going beyond fixing rates for the future, stating that he was "now free to determine a reasonable rate for the period antedating any order he may now make," that is to say, during a period following his former invalid order. The Court noted the duty of the administrative agencies and of the courts judicially reviewing their action to coordinate their actions in order to secure the plainly indicated objects of the statute.

We think that in this case this court cannot as a practical matter apply the substantive rule of law set forth in § 18 (c) (5) of the Act unless it has before it for review an order of the Comptroller made pursuant to the requirements of that section. Not only because we are here required to review an administrative order as a part of our consideration of this case, but also because the Comptroller has made himself a party to this proceeding and subject to our orders, we shall now remand the cause to the Comptroller with directions to proceed to make the determinations called for by the Bank

Merger Act of 1966. This we think to be appropriate in view of the requirements of the Act notwithstanding the actual merger has been completed.

This remand is predicated upon the assumption that after a new order has been made by the Comptroller, we will be able to review the same. As we have indicated, our power to review any determination as to the anti-competitive effects will allow a greater exercise of our own judgment, than our power to review a determination as to whether the anti-competitive effects, if any, are clearly outweighed in the public interest and as to the effect of the transaction in meeting the needs and convenience of the community to be served. In making his determination the Comptroller should make specific findings as to the competitive situation as to which the merger may have operative effects and particularly whether the merger will have a probable tendency to lessen or do away with potential competition.

■■ In passing upon the question of the probable effect of the transaction in meeting the needs and convenience of the community to be served, the Comptroller should specify particularly what he finds to be the convenience and needs of the community, what he considers will be the effect of the merger thereon, and how and by what means he weighs these effects as against the anti-competitive effects of the transaction. Furthermore, in order to avoid any possible necessity for further remand following our review of the Comptroller's order, he is directed to make a finding as to whether, assuming that the merger has the effect upon

11. In that case the Secretary of Agriculture made an order reducing stockyards rates. After those rates had gone into effect the Supreme Court set aside the order of the Secretary because of procedural defects and the cause was remanded to the district court for further proceedings. The Court stated that it would not attempt to forecast what further proceedings the Secretary might see fit to take. The district court which had entered a temporary restraining order enjoining the enforcement of the Secretary's order had required the ex-

cess charges collected by the stockyards over and above the amount prescribed by the Secretary to be deposited with the court pending final determination of the case. The Secretary then reopened the original proceedings and pending these proceedings the district court granted the appellees' motion to distribute the fund mentioned among them. This decision was based upon a ruling that the Secretary did not have authority to make an order prescribing rates and charges effective as of the date of his original order.

potential competition which the Government claims, that effect would be outweighed in the public interest by the probable effect of the transaction in meeting the interest and convenience of the community to be served.[12]

In holding that our function now, under the 1966 Act, is to review an appropriate order of the Comptroller, we are disapproving other alternatives. One alternative would be to hold that we must disregard any suggestion for a review and simply decide the case on the evidence now before us, applying directly the standards set forth in § 18(c) (5). Such, we think would not be consonant with the clear purpose and intent of the Act. Plainly the whole intent was that there should be made available in determining the validity of bank mergers the expertise of persons familiar with banking and with the operating procedures of banks. Not only is this court constitutionally without power to evaluate such features of the "probable effect of the transaction in meeting the convenience and needs of the community to be served," but we lack the informed experience properly to apply such tests.

To deny the banks involved in these three "post-Philadelphia" actions the benefits of these banking-economic tests by specialized agencies would run counter to what the legislative history of the Act indicates was the attitude of Congress toward these three mergers. As the bill first came from the Senate it would have provided that this merger "shall be exempt from the antitrust laws." In its final form the bill exempted only the pre-Philadelphia mergers. But the bill would, as Senator Robertson stated, "permit the continuance of proceedings against the three post-Philadelphia cases—in Nashville, San Francisco, and St. Louis—where mergers were consummated after that decision, but in these three cases the courts would be directed to follow the new statutory standards laid down in the statute

for all mergers to be considered in the future." Surely Congress was not swinging from a most favorable treatment of this merger to an opposite extreme of denying it the expertise contemplated for all mergers in the future.

Another holding, in the alternative, would be that since this court cannot validly entertain a question as to "the probable effect of the transaction in meeting the convenience and needs of the community to be served," the requirement that we "shall apply the substantive rule of law set forth in § 18(c) (5)" must be held inoperative and disregarded, and therefore this action must proceed as if the Act had not been passed. Such an unnecessary and uncalled for disregard of the obvious purpose and intent of the Act is unthinkable.

We anticipate that the defendant banks will suggest that we should simplify this whole matter by finding now, once and for all, that the claimed adverse effect upon competition has not been established and that the merger will not have the effect either substantially to lessen competition, whether actual or potential, or to tend to create a monopoly or operate in restraint of trade. But, as indicated in Seaboard Air Line R. Co., supra, that is not the ultimate question to be determined in this litigation, and we shall not invite a repetition of the error corrected in that case.

It is therefore ordered that further proceedings herein shall be stayed pending the further consideration by the Comptroller, in the manner hereinabove indicated, of the questions required to be passed upon under § 18(c) (5). In reaching his determination the Comptroller will, of course, give the notices and provide the opportunity for hearing contemplated by the Act. We assume the parties will assist in shortening the proceedings by agreeing that the Comptroller may consider the evidence adduced at our last hearing, as well as that

---

12. Note the usefulness of findings based on assumptions made by the district court in United States v. Philadelphia Nat.

Bank, supra, at p. 335 of 374 U.S., 83 S.Ct. 1715.

at his first hearing, particularly in view of the rule that administrative agencies have never been restricted by the rigid rules of evidence. Federal Trade Comm. v. Cement Institute, 333 U.S. 683, 705, 68 S.Ct. 793, 92 L.Ed. 1010; cf. Davis, Administrative Law, vol. 2, § 14.08.

Upon certification to this court of the proceedings of the Comptroller, this court shall proceed in such manner as may be called for by the Comptroller's decision.

It is so ordered.

This opinion contains the court's findings and conclusions.